LANDRY, Judge.
Sentry Insurance Company (Appellant), appeals from judgment awarding Plaintiffs *842 Clarence and Inez Prestenbach (Appellees) $40,000 each for the alleged wrongful death of Appellee’s son, Michael James Prestenbach, who was killed in a one vehicle automobile accident. The mishap occurred when a 1969 Ford Mustang, owned and driven by Appellant’s insured, Harley Blanco, Jr. (Blanco), left the highway at high speed and overturned in an adjacent borrow pit filled with water. We reverse and render judgment in favor of Appellant upon finding Decedent guilty of assumption of risk in riding with a driver whose driving ability was known to be impaired by consumption of alcohol.
The accident occurred at approximately 2:30 A.M., June 16, 1973, on U.S. Highway 90, in the vicinity of Morgan City, St. Mary Parish. Blanco, then approximately 19 or 20 years of age, was proceeding from Houma to Morgan City, Louisiana, accompanied by four friends in conclusion of a night of partying which commenced at approximately 8:00 P.M. Miss Juanita Kay Green, then approximately 16 years of age was seated in the right front bucket seat of the vehicle. Mark Joseph Banks, also 16 years of age at the time, was seated on the right of the rear seat. The left rear seat was occupied by Joe Marino, 18 years of age. Decedent, 18 years old, sat in the center of the rear seat.
The automobile left the highway and came to rest upside down in the water filled borrow pit. Blanco and Decedent drowned before they could be extricated from the vehicle. The remaining occupants escaped and survived to testify at trial. It is conceded that Blanco was negligent in driving at approximately 100 miles per hour and in losing control of his vehicle, apparently after striking a “hump” in the highway. Appellant’s coverage of the Blanco automobile is also conceded. The defense of this action rests solely on the contention that Decedent was contribu-torily negligent and/or assumed the risk of riding with Blanco whom Decedent knew or should have known to have been intoxicated to the extent that he could not safely operate a motor vehicle. Alternatively, Appellant maintains the awards of damages were excessive.
This appeal presents factual determinations which must be made in the light of well-established principles governing applicability of the assumption of risk doctrine (often referred to as contributory negligence) in instances where a guest passenger rides with a host driver whose mental and physical faculties are impaired because of alcoholic consumption. Our jurisprudence is well established to the effect that a person, who voluntarily rides with a driver who is intoxicated to the extent that the driver has lost control of his normal physical and mental faculties, may not recover for injuries sustained in an ensuing accident where the injured plaintiff knows or has reason to know of the driver’s intoxication and where the alcohol induced impairment of the host driver’s driving ability contributes substantially to the occurrence of the accident. Marcotte v. Travelers Insurance Company, 258 La. 989, 249 So.2d 105; Jones v. Continental Casualty Company of Chicago, Illinois, 246 La. 921, 169 So.2d 50; Magee v. McCree, La.App., 278 So.2d 587; Church v. Allstate Insurance Co., La.App., 242 So. 2d 646.
The record discloses that at about 8:00 P.M. on June 15, 1973, Blanco and Banks left work at a Morgan City supermarket in Blanco’s automobile. The two young friends went directly to a nearby liquor store and each purchased a fifth of strawberry wine containing 9% alcohol. Blanco then drove around town for a while during which interval Blanco drank half of his fifth of wine and Banks drank the remaining half of Blanco’s bottle as well as all of Banks’ own bottle. Blanco then drove to his home where he changed clothes and telephoned two other friends, namely, Decedent and Joe Marino, both of whom Blanco picked up in his car. Banks testified that the group of four purchased three *843 additional bottles of wine which the friends consumed in more or less equal portions. Marino denied any wine was purchased after he was picked up. Apparently, Marino was the last to be picked up because he testified that the group had two or three bottles of wine in the car when they came to his house. Marino also testified that most of the wine had been consumed before he joined the group. At approximately 10:00 P.M. Blanco drove to a roadside hamburger stand where the group ordered and consumed some food, presumably a large hamburger, soft drink and french fried potatoes. While eating, the group met another acquaintance, Mike Dragna, who agreed to go along to a party held at a private home in nearby Bayou Vista. Dragna joined the group after disposing of his own car at his grandmother’s home nearby.
Blanco then drove to Bayou Vista and arrived at the party at approximately 10:30-11:00 P.M. Banks testified that no alcoholic beverages were served at the party, except the remains of the wine which his own group brought along. However, Dragna contradicted Banks by testifying that alcoholic drinks were readily available at the party, including wine and whiskey. No witness saw Blanco partake of alcohol at the party although it is conceded that no witness was in Blanco’s presence during Blanco’s entire stay at the party. After a short time at the party, Dragna expressed the desire to go home. Banks and Marino borrowed Blanco’s car to take Dragna to the home of Dragna’s grandmother where Dragna was to spend the night. When Dragna got out of the car at his grandmother’s home, he cautioned Banks and Marino to watch Blanco because Dragna thought Blanco was “tense” or “up tight” about something or other. Dragna explained at trial that he did not at this time consider Blanco to be drunk but merely felt Blanco had some problem which Drag-na believed to be personal.
About midnight Blanco, Marino, Banks and Decedent decided to leave the party to return to their respective homes. At this time they were joined by Miss Green who wished a ride home. After leaving the party, Blanco stopped in-Berwick, Louisiana, where the group purchased two six-packs of beer. Apparently the friends shared the beer in more or less equal portions, except for Miss Green who drank at most one beer. After purchasing the beer the group decided to go to the Lighthouse Lounge in Houma, Louisiana. After reaching Houma, Blanco stopped at a service station and obtained directions to the Lighthouse Lounge. Instead, however, the group went to Mickey’s Lounge in the same city, apparently because fraternity brothers of Decedent worked there as bartenders. At Mickey’s the four young men purchased a beer each. Miss Green, who had become ill, did not enter the lounge. After about 10 minutes in Mickey’s, Blanco went outside and remained in the car with Miss Green. Approximately 20 minutes later Banks and Marino joined Blanco and Miss Green in the car.
The group then elected to return to their respective homes in Morgan City. Blanco proceeded toward Morgan City without undue incident until shortly after passing the Avondale Shipyard situated between Hou-ma and Morgan City. Marino, seated on the left of the rear seat, testified that he observed the speedometer reach 100 or 110 miles per hour. According to Marino, Decedent was seated in the center of the rear seat leaning forward between the front bucket seats talking with Blanco and thus also could see the speedometer. Marino recalled that after Blanco began to speed up, Decedent warned Blanco of a bump in the road ahead and that Decedent also told Blanco that Decedent had once struck the bump at high speed and almost lost control of his car. Additionally, Marino recalled that about four or five seconds before the accident Decedent told Blanco something to the effect, “Slow down, the engine can’t take the strain”.
Marino, Banks, Miss Green and Dragna, all testified that in their opinion Blanco at *844 no time exhibited overt signs of intoxication. All stated that Blanco’s speech was not slurred, that he was not staggering and that he displayed no signs of lack of coordination or mental confusion. Lester Harold Wilde, Jr., Manager, Mickey’s Lounge, testified that when Blanco came into that establishment, Blanco was in a good mood, a party mood, but was not drunk. Wilde considered that Blanco was in a normal mood for a person in a bar who had had a few drinks.
At approximately 6:30 A.M., four hours after the accident, autopsies on the bodies of Decedent and Blanco were performed by Dr. Henry H. Sykes, Jr., Pathologist, Coroner, St. Mary Parish. The examination disclosed that Blanco had a blood alcohol content of .124 milligrams per cent and that Decedent had a blood alcohol content of .044 milligrams per cent.
Dr. Sykes, called on behalf of Appellees, testified that the alcoholic content of one twelve ounce can of beer is the equivalent of one ounce of 85 proof alcohol. He stated that a reading of .124 could be attained by an average person (one weighing 150 to 175 pounds) consuming six to eight 12-ounce cans of beer or an equal number of ounces of 85 proof whiskey. He noted that the amount of alcohol required to produce the same level in a larger person would increase proportionately with the person’s weight and size. In this regard we note that Decedent was approximately 6 feet tall and weighed 185 pounds. Dr. Sykes also noted that three or four twelve ounce cans of beer would produce a reading of .05 in the average individual and result in a state of euphoria not noticeable by an ordinary person. Dr. Sykes was of the view that a person having drunk three or four cans .of, beer was capable of safe operation of a motor vehicle. He also stated that the average person burns up approximately .015 milligrams of alcohol per hour and explained that a person with a reading of .150 would, have a zero reading after ten hours, provided he consumed no additional alcohol. Dr. Sykes was of the opinion a person with a .124 reading would not necessarily be incapable of safe operation of a motor vehicle. He testified that the effect of such a reading would depend upon the individual’s drinking habits and tolerance of alcohol. While Dr. Sykes was of the view a person with a .124 reading would not exhibit signs of instability or impaired mental or physical faculties to an untrained layman, he acknowedged that such impairment would be revealed if the individual were required to perform specific tasks.
Dr. Evariste J. Trahan, Pathologist, called by Appellees, agreed with Dr. Sykes concerning the amount of alcohol required to attain certain blood level alcoholic content and also as to the amount of alcohol dissipated hourly by the average individual’s bodily processes. According to Dr. Trahan, a person with a .124 reading would not display symptoms of instability evident to an untrained individual. He readily conceded, however, that changes occur in the average person at readings between .100 and .150. He explained that these changes commence with impairment of judgment, which effects are not measurable by visual observation. He also agreed that the amount of alcohol required to reach a reading of .124 would vary depending upon the individual’s size, weight, drinking habits and condition of the thyroid glands which control the metabolic processes. In Dr. Trahan’s opinion, a person with a .100 reading is capable of operating a motor vehicle, but not safely so. He also stated that a person with a reading of .05 may be mentally impaired as regards safe driving of an automobile. He acknowledged, however, that the effect of alcohol upon any given individual will vary depending upon drinking habits. According to Dr. Trahan, the effects of alcohol would not become noticeable to an untrained observer until a reading of .150 is reached and that usually signs of intoxication will become evident to an untrained observer at readings between .150 and .2.
*845 Appearing on behalf of Appellant, Dr. Albert L. McQuown, Pathologist, testifying by deposition, agreed in essence with Drs. Sykes and Trahan in their general observations regarding the amount of alcohol required to attain specific blood levels in the average person and also as to the amount of alcohol metabolized by the average person in an hour. Dr. Mc-Quown also stated that in general a reading of .05 will produce some euphoria with basically no potential behavior changes. At a level of .085 an imbiber will show some signs of inability to coordinate well but not necessarily show effects of true intoxication. In Dr. McQuown’s opinion, a person with a reading of .100 will exhibit definite signs of poor coordination, especially to perform specific tasks. Dr. Mc-Quown also testified that a person with a reading of .100 is incapable of safe driving and would be even more so with a reading of .124 because instability would be more evident and coordination poorer. According to Dr. McQuown, at .150 gradual confusion of the senses commences although at this stage a person is not considered socially intoxicated, only happy, notwithstanding a marked inability for performance of specific tasks. At .25, according to Dr. McQuown a person reaches the stupor area and may be said to be drunk.
All of the experts agreed that, in the criminal field, the majority of jurisdictions set a reading of no more than .100 as the level at which intoxication is presumed. We add, however, that the presumption of intoxication at a level of .100, as provided by our own criminal statute, La.R.S. 32:662, is inapplicable in civil cases. We are in agreement with the jurisprudence established in Brown v. Collins, La.App., 223 So.2d 453, that in a civil case, the party alleging intoxication must establish by a preponderance of evidence that the normal mental and physical faculties of the party involved were impaired to the extent that the individual was incapable of safe driving. We find that in this instance Appellant has established this salient fact to the degree of certainty required by law.
We next determine whether Decedent knew or should have known of Blanco’s condition. In this regard Appellees contend that a guest passenger is not required to test a driver’s condition prior to entering a vehicle but merely to make reasonable observations as to the driver’s condition and to react reasonably to such observations. Appellees rely considerably upon the pronouncement in Galmiche v. Smith, La.App., 269 So.2d 490, to the effect that a guest passenger is under a duty to decline a ride only if the intended driver is so obviously intoxicated that it would be patently unsafe to ride with him. On this premise, Appellees contend that even if Blanco were intoxicated, Decedent did not assume the risk of riding with an intoxicated driver because the evidence is to the effect that Blanco at no time showed visible evidence of intoxication or instability.
We note that the mentioned holding in Galmiche, above, is not supported by citation of authority. We believe the rule thus announced is contrary to the weight of our jurisprudence on the subject. We understand our jurisprudence to hold that where the attending circumstances are such that a person knows, or has reason to' know, that his host driver has imbibed to the extent the host’s mental and physical faculties are impaired to a degree that renders the host an unsafe driver, such a guest passenger assumes the risk of riding with an unsafe driver. Jones v. Continental Casualty Company of Chicago, Illinois, above; Magee v. McCree, above; Church v. Allstate Insurance Co., above.
In this instance the record shows that prior to 10:00 P.M., Decedent and his host driver, were members of a group of three or four young friends who purchased three fifths of wine and shared the beverages, consuming virtually all thereof by 10:00 P.M., at which time all partook of food. After eating, the group attended a party *846 where alcoholic beverages were available. Upon leaving the party at about midnight the group, which had increased to five, purchased two six packs of beer which were presumably consumed in equal portions save for one who drank only one beer. At somewhere around 1:30 or 2:00 A.M., Decedent and his host driver had one additional beer. The accident occurred at 2:30 A.M., and at 6:30 A.M. Decedent’s host driver was found to have a blood alcohol content of .124 which the record shows to be intoxicating to the average person. The record establishes that such a blood level requires ingestion of the equivalent of six to eight 12-ounce cans of beer, the alcohol from which is still in one’s system. Since the average individual dissipates .015 milligrams of alcohol hourly, the conclusion is inescapable that Blanco either drank the equivalent of at least two beers hourly commencing at approximately 9:00 P.M. or else drank six or eight cans of beer within a relatively short time of the accident.
While the record does not show that Decedent saw Blanco take every drink Blanco consumed, Decedent was in Blanco’s presence most of the time and had ample reason to know the extent to which Blanco was imbibing. In this respect we note Banks’ testimony that when the group left Houma he was “feeling pretty good” and everyone in the party was having a good time. We also note Wilder’s testimony that when Blanco left Mickey’s Lounge, Blanco was in a normal mood for a person who had taken a few drinks.
Although the record indicates Blan-co showed no overt signs of intoxication, we nevertheless conclude Decedent should have known of Blanco’s true condition. According to the expert testimony, there is no question but that Blanco had drunk to excess and that his mental and physical faculties were impaired, notwithstanding such impairment may not have been visible to an untrained observer. The record also establishes by a preponderance of evidence that Decedent’s association and contact with Blanco during the period in question was of such intimacy that Decedent had every reason to know the extent of Blan-co’s alcoholic consumption. Although Decedent did not see Blanco take every drink Blanco consumed, Decedent did in fact see Blanco take numerous drinks during the interval in question. Decedent was on an evening out with Blanco and other friends. Drinking appeared the order of the day and the group apparently purchased or had other access to drinks as their desires dictated. Decedent had every reason to know that Blanco probably took additional drinks out of Decedent’s actual presence. We find such circumstances sufficient to charge a reasonably normal and intelligent individual with notice that a host driver, having so imbibed, is incapable of safe operation of a motor vehicle.
We also find that the record estab-i lishes that Blanco’s condition was a substantial contributing cause of the accident. The record shows there was no compelling reason why the group should return to Morgan City at other than a legal and reasonable rate of speed. Nevertheless, Miss Green testified that Blanco left Houma driving at a high rate of speed and that at some point before the accident she had requested that he slow down. Under cross-examination Banks admitted having given a prior statement to the effect that Blanco began driving at a speed of 85 to 90 miles per hour shortly after leaving Houma whereas at trial he testified that Blanco began speeding only a few moments before the accident. Dr. McQuown, given a resume of the circumstances and events attending the accident, expressed the opinion that Blanco’s impaired driving ability was a substantial contributing cause of the accident. We agree with this conclusion inasmuch as impaired driving ability appears the only logical explanation for the highly irrational conduct of Blanco which caused the tragedy.
*847 We are mindful that this case primarily involves factual findings and that such determinations by triers of fact should not be disturbed on appeal except in case of manifest error. Canter v. Koehring, La., 283 So.2d 716; Veazey v. Nassar, La. App., 285 So.2d 263. Nevertheless, in view of our constitutional mandate to review facts as well as law on civil appeals, it is our duty to reverse on factual findings where the conclusions of the trier of fact appear to be patently erroneous. In this instance we find such error. La.Const. of 1974 Art. V, Sec. 10(B).
The judgment of the trial court is reversed and judgment rendered herein rejecting the claims of Plaintiffs Clarence and Inez Prestenbach and dismissing said Plaintiffs’ claims, at Plaintiffs’ cost.
Reversed and rendered.