340 So.2d 1331 (1976)
Clarence and Inez PRESTENBACH, Plaintiffs-Appellees-Relators,
v.
SENTRY INSURANCE COMPANY, Defendant-Appellant-Respondent.
No. 58013.
Supreme Court of Louisiana.
December 13, 1976.
Rehearing Denied January 21, 1977.
*1333 William D. Hunter, Dale P. Martin, Lippman, Hunter & Rawls, Morgan City, for plaintiff-applicant.
Daniel R. Atkinson, Dale, Owen, Richardson, Taylor & Mathews, Baton Rouge, for defendant-respondent.
TATE, Justice.
The plaintiffs sue to recover for the wrongful death of their son, Michael Prestenbach, age 18. Michael was drowned when the vehicle driven by his friend Blanco, age 19, left the highway and overturned in an adjacent water-filled borrow pit.
The trial court awarded judgment against the defendant, Blanco's liability insurer. The court of appeal reversed, holding that Michael Prestenbach had assumed the risk of Blanco's negligence. 329 So.2d 840 (La.App. 1st Cir. 1976).
We granted certiorari, 332 So.2d 860 (La. 1976), because we thought, in so doing, the court of appeal overlooked the proper test for barring recovery on the basis of assumption of risk.
The ultimate issue
The ultimate issue is: May recovery be barred on the basis of assumption of risk in an action for the death of a passenger against his host driver, when the accident is caused by the driver's intoxication, but the driver is not so obviously intoxicated as to charge the passenger with knowledge of his driver's intoxication?
Facts
The accident occurred about 2:30 in the morning. At approximately 8:00 p.m. on the preceding evening, Blanco and Banks, a co-worker, left their place of employment in Morgan City, rode around a short while in Blanco's Mustang, and bought two fifths of strawberry wine (9 per cent alcohol). The two boys continued to ride about the city, Blanco, the driver, drinking half of his bottle and Banks drinking all of his and the remainder of the other.
Blanco drove to his home to change his clothes. He telephoned the plaintiffs' son, Prestenbach, and another boy, Marino, and invited the two to join Banks and him for the evening.
Prestenbach and Marino joined the group at approximately 9:30 or 10:00 p.m. Prestenbach, Banks, and Marino then purchased a fifth of strawberry wine apiece. The boys then drove about, drinking wine. The survivors of the group testified that although Blanco, the driver, did not purchase wine, he did take a few sips as the bottles were passed amongst the boys.
At about 10:00 p.m., the four boys then drove to a Burger King and each purchased a large hamburger, french fries, and a milkshake. They then met Mike Dragna, who they picked up later in the evening.
The five boys then traveled to a party at Bayou Vista, a nearby community, arriving around 10:30 p.m. Although the testimony is contradictory, it does appear that alcoholic beverages were available. The boys who survived the mishap which occurred later in the evening, testified that they had not drunk at the party, neither had they seen the driver have a drink.
From the testimony adduced at trial it appears that the boys mingled at the party and had little knowledge as to what the driver actually did.
Banks and Marino left the party for approximately twenty minutes to take Dragna back to Morgan City. When they returned, Juanita Green asked for a ride home. The group (Blanco and Miss Green in the front seats; Marino, Prestenbach, and Banks in the rear) left the party at approximately 11:30 or 12:00 p.m.
The group purchased two six-packs of beer in Berwick and continued on to Morgan City. The survivors testified that Blanco drank one, maybe two beers while driving.
The group then decided to drive to a nightclub in Houma. Arriving in Houma, the group decided to go to a lounge tended by friends. It appears that the boys went inside and ordered each a beer. Shortly thereafter, Blanco returned to the car to *1334 tend to Miss Green, who was ill. Approximately twenty minutes later, the other boys rejoined Blanco and Miss Green, and the group left for Morgan City.
As they traveled on Highway 90, Blanco accelerated to approximately 100 to 110 miles per hour. It is unclear from the testimony at which point Blanco accelerated. It can be concluded, however, that this occurred just prior to the accident; for seconds before the mishap, Prestenbach told Blanco to slow down because the engine could not take the strain and a bridge ahead could not be negotiated at that speed.
Blanco did not slow down. Seconds later, the vehicle left the highway and overturned in the pit. Blanco and Prestenbach drowned. (Their companions survived.)
At 6:30 a.m., four hours after the accident, blood-alcohol tests were performed on Blanco and Prestenbach and disclosed.124 percent by weight of alcohol in Blanco's blood and .044 in Prestenbach's. (In Louisiana criminal law, a level of .100 gives rise to a presumption of intoxication. La.R.S. 32:662. In several other states, the expert testimony shows, the presumed level of intoxication is .150. In either case, however, as the court of appeal held, there is no such statutory presumption of intoxication in civil cases.)
Those who survived the accident testified that Blanco appeared "normal" during the course of the entire evening. All who testified stated that the driver did not appear to be intoxicated.
The witnesses at trial testified that the most they had seen Blanco drink was two or three beers, half a bottle of wine, and a few sips of wine from another. Mr. Wilde and Mr. Olivier, who tended bar at the lounge where the boys made their last stop that night, testified that although Blanco was in a good mood, a "party mood," he did not appear to be intoxicated. His speech was not slurred, nor were his reflexes impaired.
Dr. Lester Sykes testified that a lay person cannot detect that a person having a blood-alcohol reading of .124 is actually intoxicated. The survivors testified that Blanco drove at a normal rate of speed up to a short time prior to the accident. Dragna did testify that he had told Banks and Marino, "Y'all watch Harley. He don't look like he's acting right tonight." However, from the record, it can be concluded that the comment was made in reference to Blanco's problems with his girlfriend.
Plaintiffs contend that their son's death was caused by Blanco's negligence. It is contended by defendant that the driver was intoxicated, the accident was caused by his intoxication, and Prestenbach assumed the risk as he knew or should have known of the driver's intoxication.
Legal Principles Applicable
The law is well settled that a guest passenger riding with a driver who has been drinking excessively assumes the risk of injuries received in an accident caused in whole or in part by the driver's negligence, if the alcohol-induced impairment of the driver's ability is a substantial contributory cause of the driver's negligence and if the guest passenger knows or should have known of the driver's condition and nevertheless voluntarily rides with him. Marcotte v. Travelers Ins. Co., 258 La. 989, 249 So.2d 105 (1971); Jones v. Continental Casualty Co., 246 La. 921, 169 So.2d 50 (1964).
As with other affirmative defenses, the defendant who pleads contributory negligence or assumption of the risk bears the burden of proving it. La.C.Civ.P. art. 1005; McInnis v. Firemen's Fund Insurance Company, 322 So.2d 155 (La.1975); Marcotte v. Travelers Ins. Co., cited above. In the present case, this means that, to defeat recovery for damages caused by the driver's undoubted negligence, the defendant must prove by a preponderance of the evidence that: (1) the driver was intoxicated; (2) his intoxication was a cause of the accident; and (3) the plaintiffs' decedent knew or should have known of the driver's condition. Proof by a preponderance of the evidence simply means that, taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not. Marcotte v. Travelers Ins. Co., *1335 supra; Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971).
The driver's intoxication and its cause of the accident
The evidence preponderates that the driver of the automobile had been drinking intermittently for approximately six hours prior to the accident. The scientific evidence produced at trial reveals that the blood-alcohol content of the driver when taken produced a reading of .124.
Expert testimony was adduced at trial that a person's driving ability and judgment is impaired at that level of blood-alcohol. This evidence reasonably shows that this degree of intoxication could account for the driver's sudden acceleration in speed and subsequent loss of control of the vehicle.
Under this evidence and the testimony as to the accident, the defendant has adequately proved the driver's intoxication and its causal contribution to the accident.
Passenger's knowledge of the driver's condition
As we stated in Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971), "the determination of whether a plaintiff has assumed a risk is made by subjective inquiry . . .." See also McInnis v. Firemen's Fund Ins. Co., 322 So.2d 155 (La.1975); Prosser on Torts, pp. 447-450 (4th ed., 1971).
In order for a plaintiff to assume a risk, he must knowingly and voluntarily encounter the risk which causes his injury. McInnis v. Firemen's Fund Ins. Co., cited above. "Knowledge" is the mainstay of this defense, and it must be proved by a preponderance of the evidence.
Recovery is denied if the plaintiff knew or should have known of the risk involved. The defendant argues, and the court of appeal also held, that Prestenbach should have known of the driver's condition, simply since he had spent most of the evening with him.
However, for purposes of a knowing assumption of risk, we impute knowledge to a plaintiff, not because he was in a position to make certain observations, but only when he actually makes those observations and, from them, should reasonably have known that a risk was involved.
In the instant case, all testimony adduced at trial indicates that Blanco did not appear intoxicated. The defendants have presented no evidence that would indicate that Prestenbach had knowledge of the driver's intoxicated condition or that, from his personal observations of the driver's prior activities and condition, he should reasonably have known of this condition.
In Jones v. Continental Casualty Co., cited above, the evidence showed that the group of teenagers had been drinking together for a number of hours; at one time they had been seen parked on the side of the road engaged in a drinking party, "hollering and carrying on". There, the evidence showed that the automobile had been driven at a terrific rate of speed and in the right lane of traffic for some distance. Although all participants were killed and it could not be ascertained that the passengers had actual knowledge of the driver's condition, from the facts presented, we stated in Jones that the passengers should have known of his intoxication.
In summary, we find no error in the trial court's conclusion that the defendant failed to prove the defense of assumption of risk, and in its factual finding that the evidence does not preponderately prove that Prestenbach knew or should have known of Blanco's intoxication: There is substantial evidence that Blanco did not exhibit such overt manifestations of intoxication as would have placed a guest passenger on notice of his condition and that, during the intermittent periods they were together over the course of the evening, Prestenbach's observation of Blanco's drinking and conduct was insufficient to put him on notice of Blanco's possible intoxication. Marcotte v. Travelers Ins. Co., cited above; Jones v. Continental Casualty Co., cited above; Sutton v. Langley, 330 So.2d 321 (La.App. 2d Cir. 1976), *1336 certiorari denied, 332 So.2d 805 (La.1976); Galmiche v. Smith, 269 So.2d 490 (La.App. 4th Cir. 1972), certiorari denied, 263 La. 995, 270 So.2d 126 (1972); Johnson v. Allstate Ins. Co., 254 So.2d 91 (La.App. 3d Cir. 1971).
Conclusion
The damages awarded by the district court were within the "much discretion" of the trier of fact. Civil Code Article 1934.
For the reasons assigned, the judgment of the court of appeal is reversed, and the judgment of the trial court in favor of the plaintiffs is reinstated. The defendant to pay all costs of these proceedings.
COURT OF APPEAL JUDGMENT REVERSED, AND TRIAL COURT JUDGMENT REINSTATED.
SANDERS, C.J., dissents for the reasons assigned by SUMMERS, J.
SUMMERS, J., dissents and assigns reasons.
MARCUS, J., dissents for reasons assigned by SUMMERS, J.
SUMMERS, Justice (dissenting).
Clarence and Inez Prestenbach brought this direct action for damages for the wrongful death of their son, Michael James Prestenbach. The suit is against Sentry Insurance, A Mutual Company, the automobile liability insurer of Harley A. Blanco, Jr. A judgment in favor of plaintiffs in the trial court was reversed by the Court of Appeal, 329 So.2d 840, and certiorari was granted by this Court on plaintiffs' application. La., 332 So.2d 860. Because the trial judge made no finding of fact and gave no reasons for judgment, I am unable to determine the basis of his judgment and must rely upon the record.
About eight o'clock on the evening of June 15, 1973 Harley A. Blanco, Jr., and Mark Joseph Banks, aged 18 and 16, respectively, left their places of employment at Cannata's Supermarket in Morgan City. They entered Blanco's 1969 Mustang and rode around a short while, stopping at the Thrifty-Nifty store for two fifths of nine percent strawberry blend wine. They drank the wine as they continued to ride around, stopping after a while at Blanco's house in order that he might change clothes.
When they stopped, according to Banks, Blanco had consumed about half of his bottle, and Banks had consumed all of his. While Blanco was in the house, Banks remained in the car and started drinking what remained of the wine in Blanco's bottle. After a while Blanco called Banks into the house. When Banks entered, Blanco was talking to Michael Prestenbach on the telephone, inviting him to join them and offering to pick him up. He then called Joseph Marino, another friend, telling him he would pick him up shortly.
It was about nine o'clock when they drove by Prestenbach's house, picked him up and then went for Marino. From this point they returned to the Thrifty-Nifty, and Prestenbach, Marino and Banks bought a fifth of wine apiece. While there they encountered Mike Dragna who was going to a movie with his date. Blanco told him they would meet him later during the evening. Blanco then drove around while the others drank the wine, occasionally passing a bottle to Blanco.
The four companions then drove to the Burger King and each ordered a hamburger, fried potatoes and something to drink. It was the first food Blanco and Banks had since lunch. Dragna had also arrived at the Burger King with his date, and, while he was inside, they left a note on his truck that they would pick him up after he brought his date home. By this time the three "jugs" of wine had been consumed.
In keeping with their plan they drove by Dragna's and picked him up. From there they drove to Bayou Vista, about five miles away, to attend a party at the home of Susan Goff. Approximately fifty people were in attendance at the Goff party, and, while the evidence of what transpired there is contradictory and vague, it does appear that beer, wine and whiskey were available, and the probabilities are that Blanco had more to drink.
*1337 During their stay at the party Dragna decided to go home. He borrowed Blanco's car, and Marino and Banks accompanied him to his grandmother's house where he was spending the night. As he relinquished the car to Marino at his destination, Dragna warned Marino and Banks, "Y'all watch Harley. He don't look like he's acting right tonight." Marino then drove Blanco's car back to the party at Bayou Vista where they rejoined their friends.
In the meantime Juanita Green, who was at the party, had asked Prestenbach if he would get her a ride home. He agreed, and all five embarked in Blanco's car and headed for Morgan City. It was then about 11:30. On the way they stopped at the Minit Mart in Berwick where they purchased two six-packs of beer. Drinking continued as they rode through Morgan City, deciding to go to Houma, thirty-six miles away. As they traveled along, Blanco was speeding and Juanita Green asked him to slow down. She believed that others in the car also admonished Blanco about his fast driving, and she does not believe that Blanco heeded their protestations. At that time one member of the party, Banks, was admittedly intoxicated. While driving to Houma, Blanco joined the others in drinking the twelve cans of beer they had obtained in Berwick, though the quantity he imbibed is uncertain.
Upon arrival in Houma they sought direction to a club they were interested in, but when they were told that it was on the other side of town, they decided to stop instead at Mickey's Lounge, a bar tended by friends and fraternity brothers of Blanco's whom he had known at Nichols State University. All except Juanita Green entered the bar, and all drank beer again. Blanco left the bar first to be with Juanita Green. Her stomach was upset, and she did not feel well enough to join the others in the bar. Shortly thereafter the others rejoined Blanco in the Mustang and they headed for Morgan City. Blanco was driving, Juanita Green was in the right front seat, Marino was in the left rear seat, Prestenbach in the middle and Banks in the right rear.
As they traveled toward Morgan City, Prestenbach leaned forward and talked to Blanco. Finally Blanco accelerated the speed of the car to 100 to 110 miles per hour, according to Marino's reading of the speedometer. Prestenbach warned Blanco that "the engine wouldn't take the strain", and a bump at a bridge in the road ahead could not be negotiated at these high speeds. Notwithstanding, Blanco drove on heedlessly, crossed the bridge at this high speed and lost control of the car which left the highway and hurtled three hundred feet into a canal. As a result at 2:30 that morning Blanco and Prestenbach met a tragic death by drowning.
The highway patrolman who investigated the scene of the accident ascertained from the survivors that Blanco was speeding and would not heed their pleas to slow down. The bodies were brought to a Morgan City funeral home where the Assistant Coroner performed an alcohol blood test, soon after his arrival at 6:30 that morning. The tests disclosed .124 percent by weight of alcohol in Blanco's blood and .044 percent in Prestenbach's.
Plaintiffs claim that the death of their son was caused by the negligence of Blanco without mentioning that his negligent driving was due to intoxication. Defendant pleads the defense of contributory negligence and assumption of risk.
A passenger riding with a driver who has been drinking excessively assumes the risk of drunk driving, that is, of accidents resulting from drunk driving. Thus, when an accident occurs involving a driver whose mental or physical faculties have been materially impaired due to the influence of intoxicants, a guest passenger who knows or should know of the driver's condition and, nevertheless, voluntarily rides with him cannot recover for injuries received in an accident caused in whole or in part by the driver's negligence, if the impairment of the driver's ability is a substantial cause of the driver's negligence. Marcotte v. Travelers Insurance Co., 258 La. 989, 249 So.2d 105 (1971); Jones v. Continental Casualty Co., 246 La. 921, 169 So.2d 50 (1964).
*1338 Further, the defendant, who bears the burden of proving contributory negligence, must prove by a preponderance of the evidence that the driver's intoxication was a substantial factor contributing to the accident. Jones v. Continental Casualty Co., supra. Proof by a preponderance of the evidence simply means that, taking the evidence as a whole, such proof shows that the facts or cause sought to be proved is more probable than not. Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971).
The foregoing principles were restated in Marcotte v. Travelers Insurance Co., supra, in 1971. As stated they are applicable to the case at bar.
A first inquiry under the foregoing rules involves the intoxication of the driver. A prime factor in this consideration is the blood alcohol analysis. Here it is .124 percent. A driver whose blood analysis makes such a showing is generally considered to be under the influence of alcoholic beverages. La.Rev.Stat. 32:662.
Although Louisiana's legislation relating to tests for suspected drunken drivers considers a test result of .10 percent to create a presumption that the person is under the influence of intoxicating beverages, the statute declares that it has no application to a civil action or proceeding. Id. at § 662(C); see generally La.Rev.Stat. 32:661-68. The act is referred to here, not for the purpose of creating the presumption it affords, but as one of several factors to be considered pertinent to the issue before the Court.
Three medical experts, all pathologists, agreed with this statement made by the House of Delegates of the American Medical Association in the Manual on Alcoholism it published in the fall of 1967:
"The House of Delegates of the American Medical Association has recommended that a blood alcohol level of 0.10 percent (100 milligrams100 ml.) or more be considered as rendering the person too intoxicated to drive. Levels as low as 0.05 percent (50 mgm.100 ml.) may seriously impair the driving skills of a number of persons. Levels below 0.05 percent are ordinarily regarded as inconsequential. As they increase to 0.10 percent proportionately more persons are affected adversely, and as they reach that point or exceed it, the degree of intoxication is such that the driving skills of everyone are dangerously altered."
As the factual narrative at the beginning of this dissent discloses, the driver Blanco had imbibed an indefinite quantity of wine and beer during a period of drinking with his companions which extended from eight o'clock in the evening of June 15, 1973 to the time of his death at 2:30 the following morning. Understandably, his companions who survived the tragic episode were reluctant to incriminate him, and the high spirit of the occasion gave little opportunity for fine observations. The state of euphoria or intoxication of all those in the party was another impediment to accurate recall. There is, however, one criterion by which a more reliable judgment may be made of the alcohol Blanco consumed on that fateful occasion.
According to the medical experts, in order for an individual of Blanco's weight to accumulate a blood alcohol content of .124 percent over a period of six hours (from eight o'clock in the evening to 2:30 the following morning), it was necessary to consume seven ounces of 85 proof liquor. This would mean that during that period Blanco had consumed a minimum of seven beers, each containing one ounce of alcohol, or their equivalent in wine. This result would have to be adjusted by the known fact that alcohol consumed by such a person is dissipated or excreted through the lungs and urine at the rate of .015 percent per hour. Therefore, in six hours .09 percent of the blood alcohol would be lost. Thus, in order to produce a final result of .124 percent, it would be necessary to consume an additional 3 or 4 cans of beer. Hence, for Blanco's blood test to result in .124 percent, at least ten beers or their equivalent must have been consumed during the six hours preceding the accident. It should also be noted here that approximately four hours elapsed after Blanco's death before his blood was *1339 withdrawn for testing. This delay, according to one expert, involved further dissipation of the alcohol in the blood, the conclusion being that if the blood had been tested sooner, a higher concentration of alcohol would have been present. From these facts the evidence preponderates that Blanco was intoxicated prior to and at the time of the mishap.
The next step in the solution of the problem this case presents is to determine whether Blanco's intoxication caused Prestenbach's death. In my view the intoxication of the driver was the primary and proximate cause of the accident. Recognizing, as I do, that the level of alcohol in Blanco's system was such that his ability to drive was seriously impaired, that the speed of the car he was driving exceeded 100 miles per hour and that he disregarded the warning Prestenbach gave of the bump in the bridge they were approaching, the resultant loss of control of the vehicle and the ensuing mishap was necessarily the direct consequence of his intoxicated condition. No rational, sober individual would hazard the consequence of such conduct, and without intoxication Blanco would not.
With these conclusions reached, the critical question then becomes whether Prestenbach knew or should have known of the driver's condition and, nevertheless, voluntarily joined him and remained with him. There is no evidence to indicate that Prestenbach's presence in the Mustang was anything but voluntary. At no time was he subjected by force, compulsion or deception to remain with Blanco. On several occasions opportunities were presented to withdrawwhen the second stop at the Thrifty-Nifty was made to get three fifths of wine; while they drank the last of the wine at the Burger King; at Susan Goff's party; when the stop was made in Berwick to buy two six-packs of beer; and, finally, in Houma at Mickey's Lounge. Also, Prestenbach could have asked Blanco to take him home as Dragna had earlier in the evening. At no time did Prestenbach make this important decision.
Finally, the conclusion is inescapable that Blanco drank much more than his friends out with him that night were willing or able to recall. The physical facts, in my view, outweigh the uncertain recall of the witnesses. Prestenbach either knew or should have known of Blanco's intoxication. I find it difficult to believe that he could have remained in Blanco's company for six hours without being aware that his driving skills were "dangerously altered". The best evidence of this was the alcohol level in Blanco's blood, a scientific finding that he must have had at least ten ounces of alcohol. And Prestenbach, who had not consumed nearly as much alcohol, his blood test disclosing only .044 percent, should have been alert enough to make the important and rational decision he apparently rejected. The circumstances indicate strongly that he assumed the risk of continuing on this venture with his intoxicated friend.
I respectfully dissent.