LOBRANO, Judge.
On August 31, 1979 Harry E. Wood and Associates (hereinafter referred to as “Wood”) and Charity Hospital of New Orleans (hereinafter referred to as Charity) entered into a contract of lease whereby Wood was to install at Charity a device known as an “Eldon Heater”. The purpose of said device was to heat the water at a considerable cost savings over the conventional hot water system. In return, Wood was to receive a percentage of the monthly cost savings realized by Charity. Attached to the contract is an exhibit which sets out the necessary formulas to determine this cost savings.
The heater began operation on January 7, 1980 and shortly thereafter, on January 14, 1980 Charity ordered it shut down because of alleged water quality problems discovered on that date. The Eldon Heater was never again placed in operation at Charity Hospital. As a result, Wood filed the instant suit to recover those profits he would have realized from the costs savings during the contractual life of this lease (two years). Additionally attorney’s fees, expert fees and costs were sought.
Following a trial on the merits before Commissioner Anthony J. Vesieh, Jr., all counsel stipulated that the matter be submitted on transcript for decision before the Honorable Judge Robert Katz.
The trial judge found that Charity breached the contract of lease and awarded Wood $75,000.00 in damages plus $2,800.00 for modifications made to the Eldon Heater at Charity’s request. Additionally expert fees and attorney’s fees were awarded. From this judgment Charity appeals. Wood answered the appeal seeking an increase in damages, expert fees and attorney’s fees.
Charity argues that the lower court committed error in two areas. They contend first, that the “contract of lease” was not perfected in accordance with the requirements of State law for public bidding and was therefore null and void. Secondly they argue that they were excused from performance of this contract under the affirmative defenses of breach of contract by the lessor due to error, mistake and impossibility of performance.
VALIDITY OF THE LEASE
Although Charity concedes that the public official who signed the contract lease had the authority and capacity to do so, they contend that it was not perfected in accordance with the provisions of La. R.S. 39:171 et seq. (prior to their repeal by Act 715 of 1979 effective July 1, 1980) and executive order No. 28 in that the contract represents an unauthorized purchase within the intent of La.R.S. 39:191 and is therefore null, void and of no effect. We find, however, that the provisions of La.R.S. 39:185 are controlling in this situation. The pertinent portions of said statute provide:
*1122 “Every effort shall be made to obtain quotations from three or more vendors when commodities are to be purchased out of schedule, except when standard equipment parts for which prices are established or when the article needed is a patented or proprietary one and therefore obtainable from only one source of supply...”
The evidence clearly reflects that the Eldon Heater was of such a nature as to come under the “proprietary exception” of the above statute. Charity’s own witness, Kenneth C. DeJean, who was employed by the Louisiana Attorney General’s Office, stated that the contract of lease was submitted to him for review and it was determined after investigation, that the contract of lease was exempt from the public bid law. His testimony is best reflected in the following answer to Charity’s inquiry:
“Q. Would you be able to tell us now what your opinion was with regard to whether or not this item was required to go out on public bid?
A. We responded in the negative in that, because of the important proprietary nature, and the fact that the Eldon Heater was patented, it could only be acquired from a single source, that it would be futile to engage in any public bidding, and, therefore, the item could be acquired without necessity for going down on advertisements and receipt of sale bids.”
Mr. DeJean further explained that this characteristic, i.e. single source, in and of itself was sufficient to exempt the contract of lease from the state bid laws.
Charity further argues that the patent for this particular unit had not been obtained at the time the lease was executed, but was obtained sometime later. Since we find that the “proprietary interest” exception is sufficient to exclude this lease from the public bid laws in effect in August, 1979, it is not necessary to decide the “patent pending” issue.
SUITABILITY OP THE ELDON HEATER
Breach of contract, error and mistake, and impossibility of performance are affirmative defenses. As such, the burden of proof is upon the party who asserts them, which burden must be maintained by a preponderance of the evidence. La.C. C.P. Art. 1005; Prestenbach v. Sentry Ins. Co., 340 So.2d 1331 (La.1976). Charity contends that the Eldon Heater was not fit for its intended purpose. More specifically they argue that the water heated by the unit is not compatible with the needs of Charity Hospital, and that it is detrimental to both human life and equipment.
It is not disputed by any of the parties that on January 14, 1980, approximately one week after the unit was put on line that the water quality at Charity Hospital deteriorated. The record reveals that on that date Wood agreed to shut down his heater because of the presence of an oily discolored appearance, objectionable taste and smell and the presence of gritty, sooty particles in the hot water. Wood contends, however, that Charity failed to prove by a preponderance of the evidence that this condition was caused by the Eldon Heater. In fact he alleges that problems other than his heater were the actual cause.
The majority of the evidence submitted by Charity consisted of expert testimony, in one form or another, as to the effect the poor water condition would have on the hospital patients and equipment, particularly the plumbing. A review of that testimony fails to substantiate the allegation that the poor water quality experienced on the 14th of January, 1980 was caused by the Eldon Heater.
Mr. Michael Epton, a graduate chemist, employed as laboratory supervisor of the New Orleans Sewerage and Water Board obtained water samples from Charity after receiving complaints. He ran tests on those samples the result of which show that the water from the cold water tap had no unusual peculiarities, whereas the hot water showed significant changes in turbidity, pH, CaCo3 and a Langler Index of negative 1.68. Without going into great *1123 detail about the various effects this quality of water might have at Charity, suffice it to say all parties agree that it would not be compatible with Charity’s needs. The issue, however, is whether Mr. Epton’s testimony supports Charity’s allegation that the Eldon Heater caused the deteriorated conditions. In this regard Mr. Epton responded that he never examined the heater, and that “I speculated that the Eldon Heater was causing the pH to decrease.” Mere speculation is not enough. Charity also presented the testimony of various other witnesses, none of whom did a detailed examination of the heater, or who could opine that it was the cause of the problems.
Warren Lawrence, Supervisor of Plumbing with the Sewerage and Water Board, only testified about the plumbing requirements necessary to put that heater, or any heater, on line. Nothing in that testimony substantiated causation.
Raymond Manning works in the office of Hospital Infection Control at Charity. He testified that on the morning of the 14th, he was able to discern certain sandy, gritty particles in the bottom of a whirlpool.
Lee Fournet, employed by the Office of Licensing and Regulation, Department of Health and Human Resources, opined that the depressed pH came from the boiler system. He stated that there would be any number of reasons why a boiler will soot, even though it is perfectly calibrated, and perfectly tuned for complete combustion.
The opinion of Paul Gilbert, Chief Chemist of Gessco Chemical Company, is based strictly on theory and not on any examination or tests of the Eldon Heater. Of importance is his report of March 21, 1980 done at the request of Charity dealing with the effects of exposing water to flue gases. That report was based on certain assumptions which were never proved to exist in the instant ease, particularly the assumption of “maximum saturation” of the water.
Frank Wessels, district manager of BETS-ENTEC and an expert in water treatment, testified the drop in pH had to originate from C02 entering the system in the makeup of feedwater. He gave no definite conclusion as to cause of the excess C02 entering the system.
The remainder of Charity’s witnesses were all personnel who worked at the hospital and who testified about the quality of the water on the 14th, but not its cause.
On the other hand, Wood presented convincing evidence through his own testimony, and that of Dr. Jacobus, that the water problems at Charity were not caused by the Eldon Heater, but originated from other sources particularly incomplete combustion in boiler No. 3. The record clearly substantiates the following facts. First, the Eldon Heater uses the flue gases from the existing boilers at Charity to heat the water. There are no chemical by products from this system, as the heater merely mixes the water that is fed to it with the boiler gases, thus causing the temperature to rise. Secondly, the heater operated from January 7, 1980 until January 14, 1980 without any problems.[1] Third, sometime immediately prior to the problems developing on the 14th, boiler No. 3 went into operation. Shortly thereafter the Eldon Heater was shut down. Subsequently it was discovered that a piece of insulation had fallen on the intake vent of that boiler causing approximately 90% blockage.
Dr. Jacobus, Head of the Chemistry Department at Tulane University, and an admitted expert in patent readings and biochemistry concluded that incomplete combustion in boiler No. 3, caused by the blockage of the air intake, introduced soot into the Eldon Heater which was then transferred to the hot water system at Charity. This caused the oily odor, taste and appearance.
Dr. Jacobus also testified that since the Eldon Heater strips the oxygen out of the water, and since the water itself goes *1124 through a water softener prior to entering the system it (the heater) could not have caused the drop in pH. This view directly contradicts that of Mr. Wessel who testified that the pH drop was the result of the increased C02 concentration produced by the heater. Dr. Jacobus, however, pointed out that the heater cannot produce any by products, and it only utilizes what is given to it, namely flue gases and water.
After reviewing the record we are convinced that Charity failed to prove that the Eldon Heater was the “culprit”. Even though the manifest error rule does not apply in this case since the trial judge made a determination from the same “cold record” we have reviewed, we find no fault in his decision. See, Schwarz v. Bourgeois, 422 So.2d 1176 (La.App. 4th Cir.1982).
DAMAGES
Wood answered this appeal requesting that we raise the award of $75,000.00 granted by the trial judge to $170,049.75. This latter figure is based upon the amount of savings generated during the one week operation of the heater and then computing what that savings would generate over a two year period, the term of the lease. We agree with the trial judge that the lease was subject to numerous variables which would have permitted cancellation in whole or in part by Charity. We therefore disagree with Wood that this is a ease in which the damages are susceptible to a strict mathematical calculation. We find no abuse in the award, and therefore affirm the judgment of $75,000.00 in addition to the $2,086.00 awarded for modifications made by Wood at Charity’s request.
Dr. Jacobus was awarded $3,500.00 and Mr. Wolfe was awarded $500.00 as expert witness fees. The court may tax the reasonable costs of time spent by the expert in gathering facts necessary for his testimony but not for time spent in consultations which only assists the attorney in preparation for the litigation. Additionally a court will award expert witness fees when the witness is in court testifying or in court waiting to be called to testify. But expert witness fee will not be awarded to an expert after he has testified even though he stays in court only for the purpose of consulting with the party who summons him. State Department of Highways v. Whitman, 313 So.2d 918 (La.App. 2nd Cir.1975).
The record reflects that Dr. Jacobus testified for approximately 4 hours. He also claimed 71 hours was spent in preparation for his testimony at trial.
Under the holding of Whitman, supra, we feel the award of $3,500.00 was reasonable, and therefore affirm same.
For the same reasons we hold the award to Mr. Wolfe of $500.00 was neither excessive nor inadequate.
Lastly, we turn to the issue of attorney fees. The lease provides for reasonable attorney fees in the event of failure by either party. The trial court awarded $8,500.00 to Wood’s attorneys. Because of the complexities of this case, and the amount of time necessary to prepare for same, we feel the award is inadequate. The time records submitted indicate a total of 82 hours were utilized in pre-trial preparations as well as 60 hours of actual trial time. In addition 30 additional hours were utilized in post trial work and appellate work. We conclude that attorney fees in the amount of $75.00 per hour is reasonable for both in court and out of court time, and therefore increase the award to $12,-900.00.
Accordingly the judgment of the lower court is amended to increase the attorney fees to $12,900.00. In all other respects it is affirmed.
AMENDED AND AS AMENDED AFFIRMED.

. We do note that it was shut down approximately 21 hours during this time for adjustments and/or repairs.