**Edgar J. BREAUX, Jr., Plaintiff-Appellee-Appellant,**

and

**Hughes Tool Company, Intervenor–Appellee,**

v.

**DIAMOND M DRILLING CO., Defendant and Cross Defendant–Appellant Cross–Appellee,**

v.

**UNION OIL COMPANY OF CALIFORNIA, Defendant and Cross Claimant–Appellee Cross–Appellant.**

No. 86–3405.

United States Court of Appeals, Fifth Circuit.

July 27, 1988.

Henry D. McNamara, Jr., Hailey, McNamara, Hall, Larmann & Papale, Tom Richard, Jr., Metairie, La., for Diamond M Drilling Co.

Michael J. Samanie, David B. Allen, Samanie & Barnes, Houma, La., for Breaux.

J. Mark Graham, Henderson, Hanemann & Morris, Houma, La., for Union Oil Co. of California.

John K. Hill, Jr., Kraig Thomas Strenge, Lafayette, La., for B.J. Hughes, Inc.

Before CLARK, Chief Judge, BROWN, and JOHNSON, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

After argument in this case, another panel of this Court certified to the Louisiana Supreme Court the question:

Does assumption of risk serve as a total bar to recovery by a plaintiff in a negligence case, or does it only result in a reduction of recovery under the Louisiana comparative negligence statute?

*Murray v. Ramada Inn, Inc.,* 821 F.2d 272, 276 (1987). The Louisiana Supreme Court accepted certification, 514 So.2d 21 (La.1987), and we withheld our decision in this case pending its action. The Louisiana Supreme Court has now responded [1] that assumption of risk does not serve as a total bar to a plaintiff's recovery in a negligence case.[2] The result is that not only do we affirm, but we wipe out related contentions that the trial court erred in not granting a directed verdict, *j.n.o.v.* following verdict, or formal submission of a charge on assumption of risk.

The jury on special interrogatories, F.R. Civ.P. 49(a), found Diamond M negligent to the extent of 85% with Breaux guilty of 15% comparative fault, and fixed damages at $800,000.

### Who, What and Where

Breaux, the successful victim-appellee, was employed by B.J. Hughes as a service engineer. His task was to operate the B.J. Hughes high pressure pump. The pump was located upon Diamond M Rig 98, which was then drilling an oil well on Union Oil's Ship Shoal 208–9 Platform on the Outer Continental Shelf adjacent to Louisiana.[3]

If in the Oriental tradition, a picture is worth a thousand words, our descriptive problem is more severe since even the photographs are barely revealing, with or without the witnesses' best efforts to pinpoint actions by "x" and "o". It suffices that although the BJ unit is only one piece of equipment, it comprises three distinct and separate parts or areas. The first is the tanks in which the fluid being pumped downhole was stored. These tanks were calibrated to give an accurate account of the number of barrels being pumped downhole. The second section is the work sta-

---

1. 521 So.2d 1123.

2. In light of the Court's response, we requested and received supplemental briefs from both parties concerning its impact upon this case.

3. Under *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), Louisiana is the controlling vicarious law.

tion. The work station was approximately five feet from the deck of Rig 98. One had to climb up on the top of the work station via a ladder. The work station had handrails and various controls used to operate the pumps. The third section is the "fluid end." This was the actual mechanical pump of the unit. This section pressurized the liquids being pumped downhole and was the section which Breaux was attempting to clean at the time of his injuries.

### Shakers Shaking

Comes now into question the shale shakers of Diamond M Rig 98 which are at the bottom (or top) of the occurrence. The shale shakers—equipment utilizing screens which are vibrated at high speed to separate the solid cuttings from the drilling mud—were located three to five feet from the BJ pump unit. Because of this close distance in operating the shale shakers, drilling mud would be thrown from the shale shakers onto the BJ unit. To alleviate this problem an arrangement, with the acquiescence of Union Oil's rig supervisor, was made by which BJ's employees would hang a tarpaulin between the pump unit and the shale shaker. With the tarpaulin in place it eliminated the problem of mud being thrown upon the BJ unit as the shaker operated. Although, as presumably the jury found, this arrangement worked well, Diamond M's employees found it necessary from time to time to cut down the tarpaulin in order to change out the shale shaker screens. On occasion, these Diamond M employees would either cut and leave down the tarpaulin or fail to retie it, thereby allowing drilling mud to be thrown on to the BJ unit.

Thus it was when Breaux returned to Rig 98 from his seven day layoff tour. He discovered that the tarpaulin was cut down and the BJ unit covered with drilling mud. The following morning, while attempting to climb upon the fluid end of the BJ unit to begin cleaning it, Breaux slipped and fell in the mud. Thereby hangs, not the tarpaulin, but this tale.

For the proper functioning of the BJ unit, Breaux had to clean the unit free of mud. According to him, to properly clean the unit it was necessary that he physically stand on top of the unit and wash it down with soap and water. It was not possible to stand either upon the work station or on the work deck on which the unit was resting.

Although just exactly what Breaux was doing, or where he was standing, what he was trying to do, or how he got into that position is both difficult to discern and more difficult to recite, it does not matter for our purposes. This is so because Diamond M's very careful, legitimate cross-examination of Breaux disclosed in a pointed way these facts. Not only could he have hosed down the area on which he would have to stand, but scrubbing would have to be done to get it clean since the place on which he intended to stand had wet mud on it. To cap it all off, given his experience in the oil industry, he acknowledged that wet drilling mud is slippery and presents a potential hazard for people to slip. Consequently, he acknowledged that wherever there is wet drilling mud, one should avoid it to eliminate the risk of slipping.

The exact mechanism by which Breaux's fall occurred, or just exactly where or how he was standing, is of no consequence from our standpoint because, contrary to Breaux's contention, and to avoid any suggestion that our conclusion is dicta, we determine that within the *Boeing* [4] standard, the evidence raised for jury determination the issue of assumption of risk as Louisiana had then most recently restated it. "[T]o assume a risk, one must knowingly and voluntarily encounter a risk which caused him harm and must understand and appreciate the risk involved and accept it as well as the inherent possibility of danger because of the risk." *Rozell v. Louisiana Animal Breeding Cooperative, Inc.,* 496 So.2d 275, 278 (La.1986); *see also, Dorry v. LaFleur,* 399 So.2d 559 (La.1981); *Prestenbach v. Sentry Insurance Co.,* 340 So.2d 1331 (La.1976); *Langlois v. Allied Chemi-*

4. *Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir. 1969) (en banc).

**242**

cal Corp., 258 La. 1067, 249 So.2d 133 (1971).

This being so, reversal, either outright with rendition or new trial, would be required since the trial court refused to (i) submit the issue of assumption of risk or (ii) weigh it under *Boeing* on granting/refusing instructed verdict or, subsequently, *j.n.o.v.* No reversal is required after *Murray*, however. The Louisiana Supreme Court's answer to the question certified entirely eradicates assumption of risk:

> [T]he common law doctrine of assumption of risk no longer has a place in Louisiana tort law. The types of plaintiff conduct which the defense has been used to describe are governed by civilian concepts of comparative fault and duty/risk. *Assumption of risk should not survive as a distinct legal concept for any purpose....* In order to avoid further confusion in this area of the law, we believe that the courts, lawyers and litigants would best be served by no longer utilizing the term assumption of risk[.]

521 So.2d at 1132–33 and 1134 (emphasis added). In accordance with this definitive, authoritative pronouncement, this Court will not only reject all of the contentions related to assumption of risk, it takes to heart the admonition of the Supreme Court of Louisiana never, repeat never, again to use the forbidden words in Louisiana cases. "Assumption of risk" is banished from our lexicon.[5]

Diamond M also raises a contention not affected by the Louisiana Supreme Court's opinion in *Murray*. Diamond M asserts, on the basis of this Court's decisions in *Moses v. Marathon Oil Co.*, 749 F.2d 262 (5th

Cir.1985), *cert. denied,* 474 U.S. 835, 106 S.Ct. 109, 88 L.Ed.2d 89 (1985) and *CNG Producing Co. v. Columbia Gulf Transmission Corporation,* 709 F.2d 959 (5th Cir.1983), that under the civilian duty/risk analysis,[6] its purported fault was not a legal cause of the accident that injured Breaux. We disagree. Our decisions in those cases neither require nor compel a reversal here.

Affirmed.

---

**5.** Concerning banishment, we are reminded of the following exchange in an early colonial proceeding involving the banishment of Anne Hutchinson by the Massachusetts Bay Colony General Court:

> Anne H.: I desire to know wherefore I am banished.
> Gov. Winthrup: Say no more. The court knows wherefore and it is satisfied.

**6.** This analysis was described in *Shelton v. Aetna Casualty and Surety Co.,* 334 So.2d 406, 409–10 (La.1976):

> A finding that defendant's conduct was the cause in fact of plaintiff's injury ... does not establish liability. In addition, we are required to ascertain whether the landowner breaches a legal duty imposed to protect against the particular risk involved. In making this determination, the following inquiries must be made: (1) What, if any, duty was owed by the landowner to the plaintiff? (2) Was there a breach of this duty? (3) Was the risk, and harm caused, within the scope of protection afforded by the duty breached? (citations omitted)