LOTTINGER, Judge.
This is a wrongful death action filed by Mrs. Mabel Skinner, widow of James M. Skinner who died as a result of an automobile-truck collision. From a judgment in favor of the plaintiff, and against Mallard Truck Lines, Inc. (sometimes hereinafter referred to as Mallard), Materials Transport, Inc. d/b/a Southeastern Materials Company (sometimes hereinafter referred to as Materials and/or Southeastern), and Employers Commercial Union Insurance Company (sometimes hereinafter referred to as Employers) in the sum of $123,000.00, but limiting the amount of the judgment against Employers to its policy limits of $5,000.00, the plaintiff has appealed.
In addition, Trinity Universal Insurance Company (hereinafter sometimes referred to as Trinity), the workmen’s compensation insurance carrier of Mr. Skinner’s employer filed an independent suit as well as intervening in this suit for recovery of the amount of compensation paid as well as those sums that Trinity may be obligated to pay in the future. Consolidation was had for trial below, the intervention being tried by the jury and the independent suit by the judge alone. From a judgment in favor of Trinity and against Mallard, Materials, and Employers in the amount of $11,192.00, as well as all sums paid in the future under the Louisiana Workmen Compensation Act, with the judgment against Employers being limited to the $5,000.00 policy limits, and that said judgment be paid prior to the award in favor of Mrs. Mabel Skinner, Trinity has appealed. Both of these appeals have been consolidated and will be handled in this opinion, but separate judgments will be rendered.
Mrs. Skinner in filing this wrongful death action named various individuals and corporations, as well as the State of Louisiana through the Department of Highways as defendants, to wit: Roderick W. Lacombe, driver of the truck which collided with the car the decedent was operating, and later dismissed by agreement; Mallard Truck Lines, Inc., owner of the truck operated by Lacombe; H. Allen Thomason, principal stockholder or sole owner of Mallard Truck Lines, Inc. and Materials Transport, Inc. doing business as Southeastern Materials Company; Louisiana Sand & Gravel Company of Baton Rouge, Inc., later dismissed by motion of both plaintiff and intervenor; Kenny L. Riley, later dismissed on a motion for summary judgment; Feliciana Sand & Gravel Company, Inc. (hereinafter sometimes referred to as Feliciana); Hauling, Inc.,; Henry Johnston, principal stockholder and sole owner of Feliciana Sand & Gravel Company, Inc. and Hauling, Inc.; T. L. James & Company, Inc. (sometimes hereinafter referred to as T. L. James); State of Louisiana, through the Department of Highways, later dismissed on a motion for summary judgment; Highland Insurance Company, insurer of T. L. James; Employers Commercial Union Insurance Company, insurer of Mallard; General Motors Corporation, later dismissed on a motion for summary judgment; Capitol Mack, Inc., later dismissed on a motion for summary judgment; G.M.C., Inc., later dismissed on a motion for summary judgment; and Mate *374 rials Transport, Inc., doing business as Southeastern Materials Company. Trinity basically sued the same defendants, though not all of them, and in addition named Fidelity and Casualty Company of New York as a defendant.
The record points out that on March 13, 1972, the decedent, James M. Skinner, while employed by Arrow Tobacco Company, and while on company business, was driving on Hooper Road, north of Baton Rouge, when he was involved in a head-on collision with a large gravel truck operated by Lacombe, owned by Mallard, but leased to Southeastern. The head-on collision took place in Skinner’s lane of travel. There seems to be no question as to the cause of the death of Mr. Skinner as well as the negligence of the driver of the truck, for the defendants did not appeal from this judgment. Lacombe had been hauling sand and gravel to a highway construction site near the Ramah-Gross Tete section of I — 10 highway project in Iberville Parish. It further appears quite evident from the record that the truck was overweight. T. L. James was the general contractor in charge of the highway project.
In the furtherance of the completion of this project, it was necessary for T. L. James to purchase sand and gravel to be used in the construction of the highway. Thus, in September of 1970, T. L. James issued a purchase order to Feliciana for the delivery of sand and gravel to the construction site. The purchase order was for all sand and gravel needed in the project and placed in a stock pile, with the option remaining in T. L. James to exempt from the purchase order that material required for structural concrete. The purchase order stipulated that the materials would be delivered as required for $3.50 per yard. Several months elapsed between the issuance of the purchase order and the preparation and readiness of the stock pile site, and in the meantime Feliciana had secured additional work closer to its home base. Henry E. Johnston was contacted by H. Allen Thomason for the purpose of determining whether Southeastern could supply the sand and gravel to T. L. James under the purchase order issued to Feliciana. Johnston informed Thomason that it was perfectly alright with him if he could receive the approval of Henry Spohrer, the field supervisor for T. L. James on this particular project. Since Johnston had found work closer to his home base, and could realize a greater margin of profit, he was happy to have someone else fulfill his contractual obligations with T. L. James. This approval was apparently received and Southeastern commenced the delivery of sand and gravel. Southeastern did not own the trucks in which the sand and gravel was transported, but rather leased them from Mallard.
The pits from which the sand and gravel came were neither owned nor controlled by T. L. James. There were no James’s employees at the pit to either load or weigh the trucks. The trucks were weighed when they arrived at the stock pile area by scales operated by James’s employees, though at times they were operated by the truck drivers. The weight tickets of each truck which are in evidence show that as a general rule all trucks delivering the sand and gravel were overweight. Though it could not be proved that the truck involved in the accident was overweight, because its load was dumped on the highway during the collision, it was presumed that it was overweight. The only instructions and directions from T. L. James as to the delivery of the sand and gravel was that a sufficient stock pile be created and maintained. Further instructions and directions were given to truck drivers as they entered the stock pile area to show them where to deposit the sand and gravel.
Southeastern would send its invoice to Feliciana for the sand and gravel delivered to T. L. James as well as the delivery cost, and in turn Feliciana would bill T. L. James for the sand and gravel delivered, and Hauling, Inc. would bill T. L. James for the delivery cost. T. L. James would pay these two invoices by check, and Feliciana and Hauling, Inc. would deposit the payments, and within one to two weeks Southeastern *375 would be paid. The reason the billing was done in this fashion was to avoid a sales tax on the delivery cost and thus save T. L. James money.
At the end of the trial, and after having been charged by the court, the jury was presented with various interrogatories, and in answer to these found that Lacombe was negligent in the operation of his truck, that his negligence was a cause in fact of the accident, that he was qualified to drive the truck, that the truck was overloaded, and that this overload was a contributing cause in fact of the accident. It found, however, that the responsibility of seeing that the truck was not overloaded belonged to Mallard and/or Materials doing business as Southeastern. The jury determined that Lacombe was employed by Materials, that he was not a borrowed servant but that an agency relationship existed between T. L. James, Feliciana, Hauling, Southeastern, Materials and Mallard. It further found that Mallard was an independent contractor, Materials a supplier, Feliciana a supplier, Hauling an independent contractor, and T. L. James the prime contractor. It did not find that a joint adventure existed nor were any of the parties alter egos of the companies in which they were officers or stockholders.
Plaintiff, Mrs. Mabel Skinner, contends that (1) the jury erred in failing to find that Lacombe was an agent and employee of Materials, and Materials was an agent of T. L. James, thus making T. L. James liable; (2) in the alternative, the jury erred in failing to find that Hauling, Inc. was the hauling servant of T. L. James, thus making T. L. James liable; (3) in the alternative, the jury erred in failing to find that Materials was a hauling servant of Hauling, Inc., and if Hauling, Inc. was not a servant of T. L. James, it was a subcontractor, and as such T. L. James was required to carry insurance in a minimal amount of $200,-000.00 since it failed to require Hauling, Inc. to insure itself, under the terms of the contract between T. L. James and Department of Highways; (4) the jury erred in failing to find that T. L. James, Hauling, Inc., Henry Johnston, Feliciana, H. Allen Thomason were additional parties responsible and legally liable for the overloading of the truck; and (5) the jury erred in granting an inadequate award for damages.
Plaintiff-intervenor, Trinity, contends that (1) the Court erred in not correctly explaining the concepts of “agency”, “independent contractor” and “subcontractor” to the jury and (2) the jury erred by failing to find Lacombe was a borrowed employee of T. L. James and also erred in finding that T. L. James had no duty to remedy the gross overloading of the gravel trucks arriving at the job site.
As to the specification of error concerning the Trial Judge’s instructions to the jury, we are of the opinion that in light of the Supreme Court’s decision of Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975), there is no need for us to determine whether the Trial Judge was in error or not. Even if we would find the Trial Judge in error, under the holding of Gonzales, supra, rather than remanding for a new trial, we are compelled to render a decision.
A basic question to a resolution of the issues presented by this case is whether or not the sand and gravel haulers were hauling servants or employees of T. L. James, or simply an independent contractor, or whether Roderick Lacombe was a borrowed employee of T. L. James?
Based on the facts as found in the record, we are of the opinion that the sand and gravel haulers were independent contractors and Roderick Lacombe was not a borrowed employee.
Plaintiff-Skinner argues that the relationship between T. L. James and Hauling, Inc. or Materials Transport could be terminated at will, thus making the sand and gravel haulers mere employees. Though there are statements in the records by witnesses for both sides that they were of the opinion that their relationship was terminable at will, we are not convinced that it was. When T. L. James issued the purchase order for so many yards of sand and gravel to be delivered at a certain price, to a particular sand and gravel hauler, it com *376 mitted itself to purchase the sand and gravel under the terms of the purchase order. Though there was no formal written contract, T. L. James was obligated to pay for the sand and gravel, and the recipient of the purchase order was obligated to deliver. As long as the sand and gravel was being delivered as contemplated under the purchase order, the relationship could not be terminated.
We do not believe that T. L. James exercised the requisite control and direction over the hauling contractor so as to remove the hauling contractor from the class of independent contractor. It is argued by plaintiff that T. L. James could direct when, where and how the sand and gravel was to be delivered, thus giving him complete control over the hauling contractor’s activities. We do not interpret the facts as found in this case to be as such. The general instructions of T. L. James to the hauling contractor was simply that a sufficient stock pile of sand and gravel be built up and be maintained once T. L. James began using sand and gravel in the manufacture of concrete. Other than designating where the sand and gravel were to be deposited at the construction site, T. L. James did not exercise any control over which routes the sand and gravel trucks were to take, the frequency of deliveries, nor which drivers could deliver, other than possibly to disapprove of an individual who drove carelessly at the construction site.
We have reviewed the case of Richardson v. Tate, 269 So.2d 278 (La.App. 4th Cir. 1972) which held that the driver of the hauling contractor was a borrowed employee of the general contractor. After comparing the facts as presented in Richardson v. Tate, supra, to the facts presented in the instant case, we do not find Richardson v. Tate to be controlling and is distinguishable from the facts in the instant case.
It is additionally argued that the trial judge and jury erred in failing to find that T. L. James, Hauling, Inc., Henry A. Johnston, Feliciana, and H. Allen Thomason were additionally responsible and legally liable for failing to remedy the overloading of the sand and gravel truck. Both appellants argued that these defendants had knowledge of the overloading, that it was in violation of state law, that this overloading created a highly dangerous condition on the highways of the state, and thus it was their duty to either stop the overloading or refuse to accept delivery of the sand and gravel because of the violation.
It occurs to us that these defendants, and in particular, T. L. James, are in no different position than an ordinary land owner who ordered several truck loads of land fill, and after several deliveries realized that they were overloaded but did nothing about it. We know of no duty imposed on these defendants, who had no direct control over the loading process, to stop the overloading or to refuse delivery. Since we conclude there is no duty, there is no error on the part of the judge or jury in failing to find them liable.
It is further argued that T. L. James was required to have insurance to cover its subcontractors, and thus it is liable. It could be reasoned that the State of Louisiana through the Department of Highways in letting contracts for various projects throughout the state mandates certain minimum insurance requirements from both the general or prime contractor as well as subcontractors doing work thereunder so as to protect members of the general public who may be injured by activities relating to the particular contract by having sufficient insurance coverage on behalf of those parties who may be at fault. It could be further said that it is the policy of the Highway Department to only let contracts to those individuals, partnerships, associations and corporations who are willing and show a desire to carry a requisite amount of public liability and property damage insurance so as to guarantee at least up to the insurance coverage payment for any damage occasioned by any member of the general public by the fault of an insured.
Carrying then this statement of public policy on the part of the State of Louisiana to its logical conclusion, one must then reason that the state would want any individu *377 al, partnership, association or corporation doing business with the state under a contract let to another to be covered by the insurance as required by the state, regardless of the legal definition or relationship that this particular entity may have with the prime contractor. As above noted, the general contract provides that not only must the prime contractor carry a certain amount of public liability and property damage insurance, but if any part of the work is sublet, similar insurance shall be provided by or in behalf of the subcontractors to cover their operations. The question therefore remains as to whether, even though Mallard Truck Lines, Inc. was classified by the jury as an independent contractor and Materials Transport, Inc. d/b/a Southeastern Materials Co. having been classified by the jury as a supplier could be further classified under the general terms of the contract and the above stated policy of the state as subcontractors.
It has been argued to the Court that the suppliers of sand and gravel must be treated as subcontractors under the interpretation of the contract since these provisions of the contract were placed in the contract by federal authorities as the United States Government was financing all interstate operations on the basis of 90% paid by the United States Government and 10% paid by the state government, and that federal law provides that a subcontract may call for the furnishing of supplies. Inasmuch as this is a contract entered into by a state agency, rather than a federal agency, we are of the opinion that any interpretation of the terms used in the contract must be controlled by applicable state law rather than federal law, irrespective of the fact that federal monies were being used partly for the funding of the contract.
We have searched the terms of the general contract, and in particular that portion requiring minimum insurance coverage, and can find no language therein defining the term “subcontractor” so as to aid this Court in determining whether the contract intended to include within the term subcontractor the suppliers of material. Further, we find no language within the contract setting forth a general policy on the part of the State of Louisiana through the Department of Highways of an intention to mandate that any and every individual, partnership, association and corporation doing business on the project authorized by the contract be covered by a minimum amount of public liability and property damage insurance. Absent these two findings, this Court must conclude that the terms “subcontractor” as used in the contract was not intended to include the supplier of materials as regards the minimum insurance coverage, and this Court cannot add that to the contract, nor can we establish such as state public policy.
Plaintiff-Skinner lastly contends that the quantum awarded by the jury was manifestly erroneous in that it was excessively low. The jury awarded Mrs. Skinner $123,000.00 without designating any breakdown in the award for loss of financial support, special damages, and damages for loss of companionship, love and affection.
Dr. Jan W. Duggar testified on behalf of Mrs. Skinner as an expert in the field of economics. In arriving at the conclusion that the economic loss to Mrs. Skinner as the result of the death of her husband amounted to $120,491.00, Dr. Duggar took into consideration the age and life expectancy of Mr. Skinner, the number of years he could be expected to continue to work, his past and future earnings, deduction therefrom personal expenses or the cost of maintenance of Mr. Skinner if he had lived, as well as discounting the total figure inasmuch as it was to be received in a lump sum rather than over a period of time.
Mrs. Skinner argues that in addition to the $120,491.00 economic loss, there was an additional loss of $3,707.85 which included the deductible amount for damages to the Skinner’s automobile, funeral and burial expenses, as well as ambulance service. She argues that it is obvious the jury gave her nothing for the loss of love, companionship and affection. She further argues that she and the deceased were a very close couple, had no children of their own, and as she *378 testified, “if all the homes in Baton Rouge was as happy as ours there would be no divorces, the judges would have to go out of business, so all I have got to say is that when they killed my husband they took all I had.” She cites to this Court the case of Cacibauda v. Gaiennie, 305 So.2d 572 (La. App. 4th Cir. 1974), rehearing denied (1975) as authority for an award of $95,000.00 for the loss of love, companionship and affection.
As we pointed out above, the jury did not itemize the damages awarded. We know not whether the jury gave any award for the loss of love, companionship and affection. By the same token, the jury could have awarded as an economic loss an amount less than that recommended by the expert witness, and thus also award damages for loss of love, etc. Though we are of the opinion that this award taken in its totality is conservative, we are not convinced that it is so conservative or low so as to allow this Court to declare it an abuse of that discretion granted juries in the awarding of damages.
JUDGMENT IN NO. 10993
Therefore, for the above and foregoing reasons the judgment of the Trial Court is affirmed. All costs of this appeal are to be paid by plaintiff-appellant.
AFFIRMED
JUDGMENT IN NO. 11057
For the reasons stated above the judgment of the Trial Court will be affirmed. All costs of this appeal to be paid by plaintiff-appellant.