372 So.2d 670 (1979)
Roy CASE
v.
ARROW TRUCKING COMPANY et al.
Dianna Cheramie ESTE et al.
v.
ARROW CONSTRUCTION COMPANY et al.
Nos. 12615, 12616.
Court of Appeal of Louisiana, First Circuit.
May 29, 1979.
Rehearing Denied July 16, 1979.
*673 William C. Kaufman, III, Baton Rouge, of counsel, for plaintiff-appellant Roy Case.
John B. Noland, Baton Rouge, of counsel, for defendants-appellants Arrow Trucking Co., Darrel Wayne Smith and Continental Ins. Co.
Joseph F. Keogh, Baton Route, of counsel, for defendant-appellant Allstate Insurance Co.
Frank A. Fertitta, Baton Rouge, of counsel, for defendant-appellee State Farm Mutual Automobile Insurance Co.
Arthur I. Robison, Lafayette, of counsel, for defendant-appellant Reserve Insurance Co.
Clark A. Richard, New Orleans, of counsel, for intervenor-appellant Dianna Cheramie Este.
Before LANDRY, COVINGTON and PONDER, JJ.
LANDRY, Judge.
Defendants, Arrow Trucking Company (Arrow), Arrow's employee, Darrel Wayne Smith (Smith), and Arrow insurers, Continental Insurance Company (Continental) and Reserve Insurance Company (Reserve), appeal the following judgments in favor of plaintiffs in these consolidated actions: Roy Case in the sum of $800,000 for personal injuries sustained while riding as guest passenger in a pickup truck owned and driven by Jimmy C. Este (deceased); and in favor of Este's widow, Dianna Cheramie Este, in the sum of $100,000 individually and $250,000 each for Este's two minor children for Este's death resulting from an accident in which Este's pickup truck collided with a tractor and 40-foot pole trailer rig driven by Smith in the course of his employment with Arrow. At the time of the accident, approximately 2:00 a. m. July 31, 1974, the tractor-trailer rig, loaded with pipe or drill system, completely blocked the two westbound lanes of U.S. Highway 190, West Baton Rouge Parish, while attempting a U-turn in an essentially rural unlighted area. Plaintiffs have either appealed or answered the appeals requesting an increase in quantum. We affirm the findings of liability and the awards to Case and Mrs. Este, but reduce the awards of the Este minors.
Allstate Insurance Company (Allstate), Este's insurer, was also made defendant in Case's original petition. By amended petition, Case also made Mrs. Este defendant on the premise that Este's negligence may have contributed to the accident. State Farm Mutual Automobile Insurance Company (State Farm) intervened in Case's suit seeking reimbursement for medical benefits paid Case pursuant to State Farm's policy on Case's automobile. Judgment was awarded State Farm in the sum of $7,500 against the defendants cast. It is stipulated that in consideration of State Farm's waiver of its claim in excess of $7,500, State Farm is entitled to judgment and payment by preference to the claims of Case in the event the judgment in favor of Case is affirmed. All original defendants in each case third partied each other for indemnity and contribution in the event of judgment in favor of plaintiffs in each suit. All said third party demands were denied.

RELEVANT, UNDISPUTED FACTS
Case and Este were members of a surveying crew in the employ of the Corps of Engineers, U.S. Army, engaged in Mississippi River revetment work in the vicinity of Morganza, Louisiana. Case, a chainman, had worked for the Corps for some time.
*674 The crew was supervised by Lawrence M. Henling, who resided in the same motel as Case and Este while on job location. Case lived near Gonzales, Louisiana; Este's home was in New Orleans. A normal work day for the crew ended between 5 and 6 p. m. On July 31, 1974, Case and Este finished work about 5:30 p. m., following which they returned to their motel accommodations. Case purchased a six-pack of beer at a nearby convenience store and telephoned his wife in Gonzales. Este and another crew member partook of beer on hand in a refrigerator in their motel unit. Both Case and Este ate dinner during which they drank about three beers. Between 8:30 and 9:00 p. m., Case and Este, accompanied by Henling, left in Este's pickup truck and went to a pool hall in New Roads where they played pool and drank two cans of beer each. At about 9:30 p. m., Case and Este decided to go bowling in Baton Rouge. They returned Henling to the motel and left for Baton Rouge about 10:00 p. m. Between 11:00 p. m. and midnight, Case and Este left the bowling alley after consuming some beer there. They proceeded to a club on U.S. Highway 190, west of the Mississippi River Bridge north of Baton Rouge. Case recalls arriving at the club and sitting at a table. He also recalls that on leaving the club, Este got into the driver's seat of the pickup. Case occupied the passenger seat and immediately lay down. He recalled nothing thereafter until he regained consciousness in the hospital after the accident.
From the club, Este proceeded westerly on U.S. 190 a distance of 1.65 miles to the scene of the accident. The highway consists of four lanes separated by a wide neutral ground. From the club, the highway extends westerly in a straight line to a sweeping 30-degree curve to the left, after which it runs due west a distance of 1.4 miles to the point of collision. The accident occurred at the site of a gap or break in the neutral ground located east of the Lobdell overpass. At the break, on the north side of the highway is a truck installation of some nature, the main building of which sits back about ¼ mile from the roadway. There is some security lighting at this installation. The highway itself is unlighted but some minimal lighting results from security lights at a wrecker service yard situated on the south side of the highway opposite the neutral ground gap. The east and west bound lanes of travel are each 21 feet wide and the neutral ground is 11½ feet wide. The total distance from the south edge of the pavement to the north edge is 55 feet, including the median strip. The shoulders on the north and south sides of the highway are 9 feet in width.
Smith was proceeding east on U.S. 190 intending to turn off onto La. 415, which is west of the Lobdell overpass, to cross the I-10 Mississippi River Bridge at Baton Rouge en route to Alabama. He was driving a tractor pulling a 40-foot pole trailer which consisted of "bolsters" on each end, connected by a 40-foot pole. The trailer was loaded with 15 to 20 joints of oil field pipe or drill stem, each joint measuring 40 to 42 feet in length, a total weight of about 40,000 pounds. The load was held in place on the bolsters by means of stakes on each side and was secured by chains. The bottom joints of pipe were approximately 53 inches above the surface of the roadway. The tractor and both the front and rear bolsters were fully lighted as required by law. There were no lights on the load between the bolsters, a violation as will hereinafter appear.
After missing his turnoff onto La. 415, Smith proceeded over the overpass and pulled off the highway onto the premises of the wrecker service yard on the south side of the highway opposite the break in the neutral ground. He consulted his maps and documents with the aid of his inside cab lights while his rig faced north, his headlights shining across the highway. He then put his tractor in first gear and pulled up to the south edge of the highway in preparation for a U-turn through the break in the median in order to proceed westerly to the point where he could take La. 415. Thus proceeding at a speed of 3 to 4 miles per hour, he crossed the eastbound lanes and continued into the westbound lanes without *675 stopping as he observed no approaching westbound traffic. He crossed the westbound lanes and when his tractor was in motion on the north shoulder of the highway, facing westerly, and while the pipe load was completely blocking the westbound lanes, Smith heard the noise of an impact but did not feel its force. He dismounted his rig and observed the Este vehicle lodged beneath the pipe load in the inside westbound lane.
It is uncontroverted that the Este vehicle was traveling straight ahead in the inside westbound lane at the moment of impact and that it left 18 feet of skid marks prior to the point of collision. The expert testimony establishes the speed of the Este vehicle at approximately 40 miles per hour prior to application of the brakes, and also at the instant of impact, because the braking involved had virtually no slowing effect prior to impact. The force of the collision sheared off the cab of Este's pickup. Este sustained massive head and face injuries resulting in his immediate death with considerable loss of blood. Case sustained injuries resulting in permanent disability and disfigurement. Blood samples taken by the parish coroner at the scene, approximately 30 to 45 minutes after the accident, showed a blood alcohol level in Este of .22 percent and a PH level (contamination factor) averaging 7.35 which is considered normal. The expert testimony establishes that alcohol affects different individuals in different degrees depending upon size, weight, frequency of consumption, physical activity, food intake and other factors. The experts agree, however, that in the average individual, a blood alcohol content of .22 produces complete intoxication. The validity of Este's blood sample is seriously and vigorously questioned for reasons hereinafter shown.

PROCEDURAL QUESTIONS
Appellants allege Este's gross contributory negligence in driving without his lights on; driving while intoxicated; and failing to maintain a proper lookout and proper control of his vehicle. Case is charged with contributory negligence and assumption of risk for riding with Este who was intoxicated to Case's alleged knowledge. Besides relying on the blood tests, Appellants sought to introduce a deposition by Henling (Este and Case's superior) to the effect that on prior occasions Case and Este had gone out together at night and consumed numerous drinks, and that on at least one occasion, had returned to the motel intoxicated to the point of giddiness and having slurred speech. Upon objection by plaintiffs, the trial court refused to allow Henling's deposition read to the jury on the ground that it had no probative value as to the question of Este's alleged intoxication on the night in question and that its admission would prejudice the jury.
During a recess conference in the course of the trial, plaintiffs indicated they would introduce in evidence the policies issued by Continental and Reserve. Defendants voiced their objection and the trial court indicated his intent to admit the policies. The insurers then agreed to stipulate to the limits of coverage subject to their objection to admissibility of such evidence. The trial court allowed the stipulation (of policy limits) to be read to the jury, subject to the objections.
Appellants offered during the trial expert testimony to establish an experimental reenactment of the accident, which included photographs taken at night for the purpose of showing visibility at the scene at the time of the accident. Plaintiffs' objection to the photographs, allegedly depicting what the human eye could see, was sustained by the trial court and the photographs were excluded.
In the Este case, interrogatories 1 and 2 were posed to the jury and answered as follows:
"1. Did any act or omission whatever of Darrell Wayne Smith amount to fault that caused damage to Jimmy C. Este and plaintiff Dianna Cheramie Este? YES X NO ___.
2. If your answer to question 1 is yes, then answer this question: Should Jimmy C. Este have reasonably foreseen *676 some such injury as he suffered as a result of his conduct and did he fail to exercise reasonable care to avoid such injury to himself? YES ___ NO X "
In the Case action, interrogatories 1 to 4 were posed to the jury and answered as follows:
"1. Did any act or omission whatever of Darrell Wayne Smith or Arrow Trucking Company amount to fault that caused damage to Roy Case? YES X NO ___
2. Did any act or omission whatever of Jimmy C. Este amount to fault that caused damage to Roy Case? YES ___ NO X 
3. If your answer to either question 1 or 2 is yes, then answer this question: Should Roy Case have reasonably foreseen some such injury as he suffered as a result of his conduct and did he fail to exercise reasonable care to avoid such injury to himself? YES ___ NO X 
4. If your answer to either question 1 or 2 is yes, and your answer to question 3 is no, then answer this question: Did Roy Case fully understand the danger involved and then voluntarily expose himself to that damage or risk of harm?
To answer yes to this question, you must answer yes to all of the following questions. If you answer no to any of the following questions, your answer to this question must be no.
(a) Was Jimmy C. Este intoxicated?
(b) Was his intoxication a substantial contributory cause of the accident?
(c) Did Roy Case know, or should he have known, of Jimmy C. Este's condition?
YES ___ NO X "

ISSUES PRESENTED
Appellants urge the following prejudicial reversible errors:
1. Refusal of the trial court to allow Henling's deposition, concerning alleged drinking habits of Este and Case, to be read to the jury.
2. Allowing policy limits to be disclosed to the jury.
3. Failing to allow introduction of photographs reenacting the scene, including photographs intended to show what the human eye could have seen.
4. Refusal of the trial court to allow expert surrebuttal evidence concerning the validity of Este's blood sample.
5. The jury finding Smith and Arrow guilty of negligence proximately causing the accident.
6. The jury failing to find Este guilty of negligence proximately causing the accident.
7. The interrogatories submitted to the jury misled and confused the jury in that they failed to properly explain and present the defense of assumption of risk applicable to Case as guest passenger of Este. Alternatively, the jury erred in deciding the assumption of risk defense against defendants.
8. Excessive awards to all plaintiffs.

EXCLUSION OF EVIDENCE OF CASE AND ESTE DRINKING TO EXCESS ON PRIOR OCCASIONS
The excluded deposition of Henling contained a detailed recitation of prior occasions when Case and Este, accompanied by Henling, went to New Roads and/or Baton Rouge for nighttime recreation. It narrated incidents of the parties remaining out until after midnight and consuming beer, and on one occasion, Case and Este returning in a giddy and intoxicated condition. Appellants maintain that Este's death and Case's absence of memory relegated Appellants to circumstantial evidence to establish Este's alleged intoxication at the time of the accident. On this premise, it is contended that evidence of prior drinking habits of Case and Este should have been received as circumstantial evidence, along with the results of the blood alcohol test, to *677 establish the intoxication alleged. It is argued that with such evidence the jury could have reasonably inferred that Este was intoxicated, and that Case was aware of Este's condition and assumed the risk of riding with an intoxicated driver.
In so contending, Appellants rely on Auzene v. Gulf Public Service Co., Inc., 188 So. 512 (La.App. 1st Cir. 1939) in which action plaintiff sought damages for personal injuries resulting from the explosion of an allegedly defective Coca-Cola bottle. Plaintiff attempted to offer evidence of similar explosions to establish an allegedly defective bottling process. The court held the evidence admissible upon noting that defendant attempted to prove its bottling process was not negligent and also noting defendant's denial of similar past occurrences.
We find Auzene, supra, factually inapposite. In this instance plaintiffs do not deny that Case and Este partook of alcohol on the night in question. Case candidly admitted having drunk several beers during the course of the evening and night. We find ample evidence in the record from which the jury might reasonably have concluded, had it chosen to do so, that Case and Este drank considerably on the occasion in question.
We also find that evidence of intoxication on previous occasions is immaterial to the question of whether an individual was intoxicated on a particular subsequent occasion. In this regard, we note that in Richard v. American Home Assurance Company, 318 So.2d 613 (La.App. 3rd Cir. 1975), evidence of a decedent's ability to drink on prior occasions without evident impairment of his faculties, was excluded in an action in which a beneficiary's claim, under a policy providing benefits for accidental death, was resisted by the insurer who asserted an exclusion of coverage based on intoxication.
We find that the prejudicial harm which might result from misinterpretation of such evidence by a juror or jurors who are opposed to consumption of alcohol, far outweighs any slight probative value such evidence may have. We conclude that the trial judge properly excluded this evidence.

ALLOWING DISCLOSURE OF POLICY LIMITS TO THE JURY
In Ashley v. Nissan Motor Corp. in U.S.A., 321 So.2d 868 (La.App. 1st Cir. 1975), the majority of a three judge panel of this court held that it was proper to withhold from a jury knowledge of the policy limits of an insurer made defendant in an action for damages. The Supreme Court denied writs in Ashley, supra, but in so doing noted, at 323 So.2d 478 (1975):
".... Although we do not approve that portion of the opinion which permitted the policy limits to be withheld from the trial jury, we cannot say that under the facts the result is incorrect."
In Domingue v. Continental Insurance Company, 348 So.2d 209 (La.App. 3rd Cir. 1977), our brothers of the Third Circuit held the foregoing language in Ashley, supra, to be a clear pronouncement by the Supreme Court that, prior jurisprudence to the contrary notwithstanding, the ability of a defendant to pay as evidenced by insurance coverage, is a matter which may be properly placed before the trial jury.
We view the language in like manner and consider it to have overruled our holding in Ashley, above, and the authorities therein relied upon. Accordingly, we find no error in the admission of such evidence.

ADMISSIBILITY OF EVIDENCE OF A REENACTMENT OF THE ACCIDENT AND PHOTOGRAPHS PURPORTING TO SHOW VISIBILITY AT THE SCENE ON THE NIGHT OF THE ACCIDENT
In February, 1976, approximately 19 months after the accident, defendants' experts, Dr. William Tonn, consulting engineer and accident reconstructionist with some expertise in photography, and John Sheehan, metallurgical engineer and accident reconstructionist, conducted and photographed a reenactment of the accident. They used the same tractor driven by Smith, an identical but different trailer, *678 and a similar pipe load. Utilizing photographs taken by Trooper Michael O'Neal, the investigating officer, and information given by Smith, they duplicated the position of Arrow's rig, took four color slides of the reenactment and had four 8" × 10" prints developed therefrom. The photos were taken by Tonn while standing on the highway and at various distances from the accident scene. On timely objection by plaintiffs, the trial court refused to admit the photographs in evidence or to allow Tonn to testify concerning the photographs except in connection with a proffer thereof made outside of the presence of the jury.
Defendants contend the photographs were admissible to show the visibility of the tractor-trailer rig on the night of the accident as it should have been seen by an average driver proceeding in the same direction as the Este pickup truck prior to the accident. It is urged that our jurisprudence sanctions the admissibility of such photographs when proper foundation has been laid establishing that the circumstances thus shown are substantially similar to those existing at the time of the accident, citing Reggio v. Louisiana Gas Service Company, 333 So.2d 395 (La.App. 4th Cir. 1976); Atkins v. Hudson, 327 So.2d 603 (La.App. 4th Cir. 1976); Messex v. Louisiana Department of Highways, 302 So.2d 40 (La.App. 3rd Cir. 1972); and Mayon v. New Amsterdam Casualty Company, 187 So.2d 767 (La. App. 1st Cir. 1966). It is argued that plaintiffs' objection goes to the weight rather than admissibility of such evidence.
We find all of the cited cases distinguishable in that none allowed the use of photographs to show the nighttime perceptibility of a motor vehicle to the human eye under circumstances allegedly recreating an accident scene and depicting lighting conditions existing at the time of the accident.
Reggio, supra, allowed the use of video tapes depicting current physical therapy treatments administered to an injured plaintiff over defendant's objection that the "film would arouse sympathy for plaintiff.
Atkins, supra, involved a dog bite case in which the identity of the animal and place of injury were in dispute. Photographs of defendant's residence were allowed in evidence from which plaintiff made a positive identification of the scene.
Mayon, supra, concerned a death case in which plaintiff's vehicle collided with defendant's truck, which was allegedly operating without lights at night and was made invisible by lime dust. We held that the trial court erred in excluding photographs taken at the scene immediately following the accident to show the condition of the truck in support of plaintiffs' allegations of negligence on defendant's part. In Mayon, supra, the photographs were not offered to show what the human eye could see at night, but merely to show the alleged condition of a vehicle. We note that the record contains photographs of the accident scene in this case, which photographs were taken by the investigating officer. These photographs were admitted below to show the position of the vehicles, not for the purpose of proving what the human eye could or should have seen.
In Messex, supra, plaintiff objected to photographs of an intersectional accident scene taken by defendant to show visibility of a driver. Despite plaintiff's objection that the daytime photographs purported to depict the scene of a nighttime accident, the photographs were admitted to show at what point defendant's vehicle first became visible to plaintiff who was stopped at a stop sign just before the accident. We distinguish Messex, supra, on the ground that the photographs involved therein did not purport to show lighting conditions at the time of an accident nor to show what the human eye could or should have seen under the circumstances. Moreover, Messex, supra, distinguished Avery v. Scott, 216 So.2d 111 (La.App. 2d Cir. 1968), wherein motion pictures were held inadmissible to show the purported degree of darkness at the time of an accident. We think that Avery, above, represents the better rule.
We so conclude, inter alia, because there is no acceptable scientific proof of record that the pictures offered depict accurately what the human eye could have seen. The *679 proffered pictures were taken outside of a vehicle; Este's view was through the windshield of his truck. Although Dr. Tonn explained in detail the distances from which the pictures were taken, the type of camera used, the film and shutter speed and the time exposure intervals, he conceded that these and other factors could affect photographic results. He also acknowledged that he adjusted the shutter speed and exposure time to properly expose the film. We find no acceptable scientific proof of record to support the conclusion that the photographs accurately reflect what the human eye can see. We note that Dr. Tonn did not develop the film himself and also his concession that photographic results may be affected by the development process. Under the circumstances, we find no error in the trial court's refusal to admit the photographs for the purpose intended.

ALLEGEDLY CONFUSING INTERROGATORIES PROPOUNDED TO THE JURY
In the Este case, the jury responded affirmatively to interrogatory 1, which inquired whether any act of Smith amounted to fault which caused injury to decedent Este and plaintiff, Dianna Cheramie Este. The jury responded negatively to the query whether Jimmy Este should have reasonably foreseen injury to himself as a result of his conduct and whether he failed to exercise reasonable care to avoid injury to himself.
In the Case suit, the jury responded affirmatively to interrogatory 1 which asked whether Smith and Arrow were at fault in causing injury to Case and negatively to interrogatory 2 which asked whether Este was guilty of fault causing injury to Case. Interrogatories 3 and 4 were posed and answered as hereinabove set forth.
Appellants contend that Case interrogatories 3 and 4 were misleading and erroneous with regard to possible application by the jury of the assumption of risk defense tendered in defense of Case's action. It is argued that, as given, these interrogatories could have been confusing to the jury because they are not mutually exclusive and Case could have been found guilty of either or both contributory negligence and assumption of risk, thus barring his recovery. Appellants concede, however, that the charges given the jury on the issues of contributory negligence and assumption of risk, were proper.
In so contending, Appellants rely on Lutrell v. Beard, 273 So.2d 312 (La.App. 4th Cir. 1973) and Viator v. Grain Dealers Mutual Insurance Company, 182 So.2d 165 (La. App. 3rd Cir. 1966) for the rule that when the intoxication of a host driver contributes to the injury of his guest passenger, the guest passenger is barred from recovering from any driver involved in the accident because of the quest's contributory negligence in riding with an intoxicated host when the guest knew or should have known of his host's impaired driving ability due to intoxication.
Conversely, plaintiffs rely on Prestenbach v. Sentry Insurance Company, 340 So.2d 1331 (La.1976), in which the Supreme Court held that contributory negligence or assumption of risk is not imputed to the guest of an intoxicated host driver merely because the guest passenger is in a position to make observations concerning the amount of alcohol consumed by his host driver. Such imputation results only when the guest actually makes such observations and, from them, should have reasonably known that a risk was involved.
There can be no question but that the rule of Prestenbach, supra, is applicable herein. The record is devoid of evidence to show that Case observed conduct on Este's part which would disclose to Case, as a reasonable individual, that Este's driving ability was impaired to the extent that it created a risk to anyone riding with Este.
The only evidence of Este's alleged intoxication is the disputed result of the test made of Este's blood alcohol level. Standing alone, if valid, it does not establish behavioral patterns on Este's part which, if observed by Case, should have alerted Case, as a reasonable person, to a risk of injury if he rode with Este.
*680 Considering the entire record, including the concerted attempt to establish the defense of contributory negligence and assumption of risk, the charge given the jury and the interrogatories involved, we find the jury was properly instructed and understood the issues thus presented. Accordingly, we find no error in the interrogatories in question.

REFUSAL TO ALLOW DEFENSE SURREBUTTAL
Near the end of trial, counsel for the Arrow defendants informed the court of his intent to call Dr. Joseph T. Brierre, Jr., pathologist, in surrebuttal of the testimony of plaintiffs' expert, Dr. Ronald Welsh, pathologist, concerning the validity of the blood sample taken from Este's body. Dr. Brierre had previously testified as to the effects of alcohol on human faculties during defendants' presentation of their case in chief. His testimony tended to support the validity of the blood sample and the analysis thereof by the state crime laboratory. Plaintiffs produced Dr. Welsh in rebuttal. Dr. Welsh contradicted Dr. Brierre as to the validity of the sample and contended the sample was totally worthless due to contamination by the contents of a ruptured internal organ (most likely the stomach) entering the pleural cavity from which Welsh felt the sample was most probably taken. No autopsy was made on Este's body to determine internal injuries, if any. Dr. Guy Otwell, the coroner who took the sample, and Dr. Brierre testified they believed Este sustained no internal injuries. Dr. Welsh believed Este's injuries were so massive that internal injury was a most distinct probability. The validity of the sample is of extreme importance in that all experts agree that, if valid, it would establish a blood alcohol content indicative of complete intoxication. Drs. Welsh and Brierre disagree as to the question of blood contamination produced by diffusion following injuries resulting from violent impact.
Counsel for defendants informed the court that he intended to refute Dr. Welsh's theories regarding contamination, particularly the diffusion issue. The trial court declined to permit surrebuttal on finding that the proposed surrebuttal was merely repetition of testimony of Dr. Brierre presented in chief. The trial court also noted that the testimony of Dr. Brierre addressed the precise issue in more detail than did the testimony of Dr. Welsh.
Appellants contend that since they have the burden of proof with respect to the defense of intoxication, they should be allowed rebuttal. La.C.C.P. Article 1632 prescribes the order of trial as follows: opening statement by plaintiff and defendant in that order; presentation of evidence by plaintiff and defendant in that order; plaintiff's rebuttal evidence; and argument of plaintiff and defendant and plaintiff's rebuttal in that order. It also provides that the prescribed trial procedure may be varied by the trial court when circumstances so justify.
We find no abuse of the trial court's refusal to allow deviation from the prescribed trial order. Defendants participated in deposing Dr. Welsh prior to trial and had ample opportunity at that time to learn his professional views in preparation for the defense of intoxication. Defendants also had Dr. Welsh under extensive cross-examination. We conclude that the trial court properly disallowed the proposed surrebuttal in this instance as merely repetitive or cumulative. See Heard v. Monroe Sand & Gravel Company, 9 La.App. 568, 121 So. 642 (2d Cir. 1928).

SMITH'S NEGLIGENCE
LSA-R.S. 32:104(A) provides that "[n]o person shall turn ... a vehicle from a direct course or move right or left upon a roadway unless and until such movement can be made with reasonable safety." Our jurisprudence holds that a driver turning across a highway must give a proper signal and make sufficient observation to insure that the turn can be made safely. A left turning motorist bears the burden of exculpating himself from the inference of negligence if involved in an accident. Tallo *681 v. Johnson, 255 So.2d 446 (La.App. 1st Cir. 1971), writ denied, 260 La. 704, 257 So.2d 157 (1972). We hold that this same rule applies to a driver making a U-turn.
Also pertinent is the following provision of LSA-R.S. 32:308(D):
"Trailers, semi-trailers and pole trailers thirty feet or more in length shall have one amber side marker lamp and one amber reflector, centrally located with respect to the length of the trailer, on each side. Pole trailers shall also have on each side, at the rearmost support for the load, one combination marker lamp showing amber to the front and red to the rear and side, mounted to indicate maximum width of the pole trailer."
The record establishes conclusively that the pole trailer in question was not equipped with the centrally located side marker lamp and reflector required by the cited statute. Otherwise it was legally lighted.
Plaintiffs maintain that Smith was negligent in not making proper observation before entering the highway in preparation for making his intended U-turn. It is argued that if he had made a proper lookout, he would have seen the approaching Este vehicle and waited until it passed. Plaintiffs also contend that absence of the required side lights on the pole trailer made the dark indistinct pipe load invisible to an oncoming motorist until it was too late for an oncoming motorist traveling at a legal rate of speed to stop in time to avoid a collision. It is conceded that Smith entered the highway at a speed of 3 to 4 miles per hour. The expert testimony places Este's vehicle approximately 1,173 feet from the point of contact, traveling at 40 to 45 miles per hour, when Smith started forward from his stopped position. Smith saw no lights indicating the approach of the Este vehicle and did not notice any westbound vehicles preceding the Este truck.
James Bowers, employee of a transport facility located on the north side of the highway opposite the break where Smith turned, testified he was standing near the transport building and saw Smith stopped on the opposite side of the highway with his turn signal on, apparently intending to make a U-turn. Bowers then saw two westbound vehicles pass before Smith entered the highway. He also saw Smith enter the highway, pass through the median gap, cross the westbound lanes and turn the cab of his truck in a westerly direction on the north shoulder of the road. Bowers then looked away for a split second, looked back again and saw a huge ball of fire. At no time did Bowers observe the lights of the approaching Este vehicle.
The record establishes that there was little, if any, lighting of the highway from adjacent premises. There was no moonlight. The accident occurred at approximately 2:00 a. m. The load of pipe blocking both westbound lanes at the moment of impact was dark, indistinct and unlighted. It presented a trap the nature of which was totally unexpected and not reasonably to be anticipated by a westbound motorist. It was a cause in fact which contributed substantially to the collision and rendered Smith liable. Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (La.1962).
Defendants maintain that Smith was not negligent in starting across the highway when he did because the Este vehicle was unlighted and not visible. Alternatively, it is argued that, if the Este vehicle were lighted, it was almost 1200 feet away when Smith began his maneuver and was so remotely distant as to not pose a danger. This position might have merit had Este been speeding. The record establishes conclusively that Este was not exceeding the 55 mile per hour speed limit. Smith, an experienced driver, must be charged with knowledge that his intended maneuver would require some time and consequent blockage of the westbound lanes. Had he seen the Este vehicle, he could reasonably expect it to be traveling at the legal rate of speed. He is charged with the duty of making allowance for its approach at that rate. If there were any doubt concerning his ability to clear the highway ahead of the approaching Este vehicle, it was incumbent *682 upon him to wait. We conclude, in our subsequent discussion of Este's alleged negligence in driving without lights, that the jury was not manifestly wrong in evidently finding that Este was not driving without lights. We find ample evidence to justify the jury finding that Smith was at fault.

ESTE'S ALLEGED NEGLIGENCE
To prove that Este was driving without lights, defendants produced John Sheehan, a metallurgical engineer who examined the light switch assembly removed from the Este vehicle approximately six weeks following the accident. Examination of subject switch and comparison with similar switches and manufacturer's specifications led Sheehan to conclude that a bend in the switch stem indicated positively that the bend occurred while the switch was in the "off" position. He reasoned that the bend, which occurred on the engine side of the dashboard, could not have resulted from impact while the switch was in the "on" position.
William P. Adams, insurance adjuster, who removed the switch, testified he used pliers to hold the stem while he easily unscrewed the pull knob. He did not retain the lock nut which secured the switch assembly to the dashboard.
Plaintiffs contend the switch was on at the instant of impact and that the force of the collision forced some portion of Este's body (probably an arm or knee) to strike the pull knob and force the switch to the "off" position. Plaintiff's expert, Dr. Gerald Whitehouse, mechanical engineer, testified that from the evidence presented by Sheehan (which included a factory detailed outlay of the design and operating procedure of the switch assembly), it was impossible to determine whether the switch was on or off at the moment of impact. He so believed because of the absence of the retaining nut and also because the damage shown could have resulted when Adams removed the switch by unscrewing the knob which was not designed to be unscrewed since it was bonded to the stem shaft. Whitehouse further declared that the damage to the stem could have occurred between the time of the accident and its removal by Adams.
From all the evidence, the jury obviously concluded that Este was not driving without his lights on. We find no manifest error in this determination inasmuch as experience teaches that it is more probable than not that Este could not have driven his vehicle almost 2 miles in total darkness, at a speed of 40 to 45 miles per hour and negotiate a 30 degree curve, at 2:00 a. m., without the aid of headlights. It is even more probable than not that he could not have done so while totally intoxicated as claimed by defendants.
Dr. Guy Otwell, coroner, West Baton Rouge Parish, arrived at the scene approximately one-half hour after the accident. Using a 5-inch long syringe, he took two samples of Este's blood by inserting the needle in the side of Este's neck into what he deemed to be the jugular vein. The samples were taken when the body was removed from the vehicle and was lying on its back on a stretcher. Before taking the samples, Dr. Otwell palpated the torso and observed no indication of internal injury or rupture of internal organs. Although Dr. Otwell admitted he did not visualize the source of the blood, he was certain that the sample was taken from the jugular vein and not the nearby pleural cavity.
The expert testimony shows that a blood sample taken from the pleural cavity may be contaminated significantly by a small amount of the content of a ruptured stomach, or other internal organs, or by the regurgitation of stomach contents resulting from severe trauma. It is agreed that a contaminated sample is of little value for analysis purposes. The sample in question showed a blood alcohol content of .22%. A PH, or contamination, test conducted some time after the accident showed a reading within normal limits. Some time after the PH test was made, the samples were inadvertently discarded and were not available for further analysis.
Dr. Joseph Brierre, pathologist, who was called by defendants, attested to the validity *683 of the samples and the probability that they were free of contamination.
Dr. Ronald A. Welsh, pathologist, who has performed approximately 5,000 autopsies of which between 500 and 1,000 involved automobile fatalities in which blood alcohol content was a factor, testified for plaintiffs. He explained that a significant change in sample taking procedure was instituted in 1968 because research showed serious error could result if samples were not taken from an uncontaminated source. He further noted that it was most important to visualize the source of the sample to insure its purity. He felt that the samples taken in this instance could not have come from the jugular vein because Este's blood loss from massive injuries caused the veins to collapse before Dr. Otwell arrived at the scene. Dr. Welsh noted that palpation does not always disclose internal injuries and, in his experience, on many occasions an autopsy revealed internal injuries not otherwise detectable. He was of the view that the injuries received by Este were such that it was more probable than not that the blood sample taken by Dr. Otwell came from the pleural cavity and was contaminated by the contents of a ruptured internal organ, probably the stomach. Dr. Welsh considered the samples totally worthless for analytical purposes.
Our jurisprudence establishes that in a civil action there is no presumption of intoxication based on blood alcohol level. Prestenbach v. Sentry Insurance Company, supra. From the testimony, the jury could have reasonably concluded the samples were not valid and did not reflect the true alcoholic level of Este's blood. Because blood alcohol content creates no presumption of intoxication in a civil case, the jury may also have reasonably found that, assuming the sample to be valid, it did not ipso facto establish the degree of Este's impaired driving ability, if any. Considering all of the evidence on the issue, we find no manifest error in the jury's rejection of the defense of intoxication.
Defendants' final contention is that, assuming Este was sober and was driving with his lights on, nevertheless he was negligent in failing to observe the fully lighted tractor-trailer rig in time to stop and avoid the accident. It is urged that Este was not keeping a proper lookout and that a reasonably alert driver could and would have seen the obstruction in time to stop.
Defendants' expert, John Sheehan, testified that five seconds before impact the Este vehicle would have been 294 feet from the point of collision, if traveling at 40 miles per hour, and 331 feet if proceeding at 45 miles per hour. Three seconds before impact, Este would have been 176 feet distant if traveling 40 miles per hour and 188 feet if driving 45 miles per hour. Using a one and one-half seconds total perception and reaction time, he determined Este's stopping distance to be 185 feet traveling at 40 miles per hour and 221 feet traveling at 45 miles per hour, well within the distances separating the vehicles five seconds prior to impact. Sheehan disagreed with Dart's use (discussed below) of a three second perception and reaction period in determining total stopping distances.
Olin Dart, civil engineer and accident reconstruction expert, conceded that as a general rule in accident reconstruction, use of one and one-half seconds perception and reaction time is average as regards a motorist's perception of, and reaction to, conditions which may ordinarily be expected, such as the change of a traffic signal. At night, however, he believed it takes longer to perceive a danger and react thereto in darkness. For this reason, he employed a three second perception and reaction time in making his calculations. He noted that in this instance perception was influenced considerably by the entry of the tractor-trailer onto the highway from the side and the fact that it was not ahead of Este on the highway. He determined that at 40 miles per hour, Este was 176 feet east of where the brake marks began three seconds before the brakes took hold; 190 feet if going 45 miles per hour and 220 feet if going 50 miles per hour. Adding these distances to the actual braking distance of 89 feet (the time required to come to a stop *684 after application of brakes) he found that total perception, reaction and stopping distances would be 265 feet at 40 miles per hour; 310 feet at 45 miles per hour and 359 feet at 50 miles per hour. Dart also computed that at 40 miles per hour, the Este vehicle was 586 feet distant when defendant's tractor was in the median and that five seconds prior to impact, the tractor was in the westbound lanes. He was of the opinion that Este could have seen the lights of the moving tractor and assumed it was moving out of his path but that Este would not have seen the trailing load of unlighted pipe.
There can be no doubt that Este saw the unlighted pipe before impact because he applied his brakes and left 18 feet of skid marks prior to the point of collision. There can also be no doubt but that the obstruction he encountered was of a totally unexpected nature. The tractor-trailer was crossing the highway at a right angle to a westbound motorist. The pipe load was unlighted on the side facing Este. The combination of circumstances and factors created by Smith could well have confused a reasonably prudent and alert driver, including one completely sober.
From a reading of the entire record, we find the jury could have reasonably concluded that even if Este were intoxicated his inebriation was not a substantial contributing cause of the accident because his perception and reaction equalled that of a driver whose ability was unimpaired. See Bland v. Interstate Fire and Casualty Co., 311 So.2d 480 (La.App. 4th Cir. 1975).

CASE'S ALLEGED ASSUMPTION OF RISK
This defense is predicated on the premise that Case knew or should have known that Este's driving ability was seriously impaired due to intoxication. In Prestenbach v. Sentry Insurance Company, supra, the Supreme Court held that to bar a guest passenger's recovery for his host's negligence due to intoxication, defendant must prove the fact of intoxication; that intoxication was a contributing cause of the accident; and that the guest passenger knew or should have known of his host's impaired driving ability. Prestenbach holds that knowledge is not imputed to a guest passenger merely because he is in a position to make the pertinent observations but is imputed only when he makes such observations and from them should reasonably have known a risk was involved. It appears clear to us that Prestenbach establishes a purely subjective determination by the guest passenger, the reasonableness of which must be determined in the light of the circumstances of each particular case.
Assuming arguendo Este was intoxicated, the record is barren of proof that Case was aware of such condition from any of Este's actions, mannerisms or driving technique. Moreover, considering the conflicting evidence in this case, we find evidence and testimony to which the jury could have properly ascribed reasonable credibility and from which it could have reasonably inferred that even if Este were intoxicated, his condition was not a contributing cause of the accident. Canter v. Koehring Company, 283 So.2d 716 (La.1973). See also Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The fact that a motorist was intoxicated does not ipso facto mandate a finding of fault. Bland v. Interstate Fire and Casualty Co., supra.
A motorist, though intoxicated, is not at fault if he exercises reasonable care under the attending circumstances. Houston v. Millers Mutual Fire Insurance Co. of Texas, 228 So.2d 488 (La.App. 3d Cir. 1969).

QUANTUMCASE
Case, who was 27 years old at the time of the accident, was granted a lump sum award of $800,000.00. His earnings justified use by economists of $11,437.30 annual wages in computing lost earnings over his 35.1 years of work-life expectancy to age 62.1 years.
Case underwent seven and one-half hours of surgery for massive head injuries involving depression of the frontal skull into the *685 frontal brain lobe. A considerable portion of his skull and significant brain tissue were removed. After repair of his skull damage, he was subjected to an additional four or five hours of surgery to repair extensive facial injuries which included reconstruction of virtually every bone in the central portion of his face. In addition to loss of part of the frontal brain lobe (which affects personality and perhaps intelligence), it is believed he suffered extensive damage to the remainder of his brain. Ten days after the initial surgery, infection required reopening of the surgical wound and removal of dead bone fragments in the forehead. Infection of the sinuses dictated further surgery in this area. The additional skull surgery left a large indentation in the skull, which condition was corrected in June 1975, by insertion of a plastic plate. An attending neurosurgeon characterized the injuries as the most severe he had ever seen. All of Case's upper teeth were loose or "floating" and were wired together in the facial reconstruction process. His upper teeth shifted from left to right and healed in that position leaving a permanent bite deformity. Until about 18 months prior to trial, Case experienced numerous epileptic type seizures which necessitated close personal supervision and hospitalization in November, 1976. His brain injuries have produced a loss of self-confidence, prolonged sleeping if not awakened, and indecision. Dr. James Poche, neurosurgeon, who performed surgery on Case, was of the opinion that Case could do sedentary work. Dr. Melvin Allen, Case's family physician, a general practitioner, considers Case unemployable because Case is uninsurable. Dr. Allen considered Case to be dependent and childlike but believed that Case could perhaps engage in some sort of self-employment.
Dr. Fred Tuton, clinical psychologist, observed signs of moderate depression and immaturity and considered Case unable to compete on the open job market. He felt that with direct supervision, Case could perhaps perform routine maintenance work.
Using an annual income of $11,437.30 and a work-life expectancy of 35.1 years, Dr. John W. Chisholm, economist, found that Case would earn $345,790.84 during a normal work career, allowing for no wage increases, which amount discounted to $158,462.09 and $139,584.37 at 5% and 6% discount, respectively. Employing a 5% discount, an annual wage increase of 3% and an annual inflation factor of 4%, Chisholm determined the present value of Case's loss of future earnings to be at least $464,544.63. It is stipulated that to date Case's medical expenses exceed $10,000.00.
In oral argument, counsel for the Arrow defendants virtually abandoned his position that the award to Case is excessive. Counsel for Reserve made no such concession.
From March to November, 1976, Case attempted to work as an instrument man with a survey crew. His employer testified that Case made a sincere effort to work but, at best, Case's performance was borderline because of Case's inability to follow simple instructions. Case left this employment in November, 1976, because of a seizure which resulted in his hospitalization. The wife of this employer testified that Case had difficulty in doing simple yard work for her. She testified that he exhibited evidence of confusion and repeatedly asked for instructions concerning routine chores.
Awards in other cases provide no scale of uniformity of awards for personal injuries; they serve only to determine whether the present award is greatly disproportionate to similar awards (if truly similar) and also to determine whether an abuse of discretion exists in the case at hand. Such abuse must be clearly demonstrated in the record before a court of appeal may alter an award of general damages. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977); Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974).
Our consideration of the record leads to the conclusion that, although the award to Case is somewhat high in comparison to awards for similar injuries in other cases, we find no abuse of the discretion vested in the trier of fact in such matters. Accordingly, we affirm the Case award.

*686 QUANTUM AWARDED MRS. ESTE
Mrs. Este requests an increase in her award from $100,000.00 to $250,000.00. Defendants concede the adequacy of the award in the event liability is affirmed. Decedent was 30 years old at the time of his death and had a work-life expectancy of 28.6 years. From January 1, 1974, to the date of his death July 31, 1974, he earned $12,306.00, on which basis his earnings were projected to $21,096.00 by Richard Camus, actuary. Using said projected earning figure and a 4% annual increase factor, he determined that Este lost earnings of $84,732.00 from the date of death until trial in April, 1978. Also using an annual earning figure of $21,096.00, Camus concluded it would take $525,849.00 to produce $21,096.00 annually over Este's work-life expectancy. Utilizing a normal wage factor of $16,454.00 (Este's earnings in the year prior to his death), Camus determined it would require $495,000.00 to produce such earnings over decedent's work-life expectancy.
Defendants cite numerous cases in which awards ranging from $82,000.00, Smith v. Taylor, 343 So.2d 313 (La.App. 2d Cir. 1977), to $123,000.00, Trinity Universal Insurance Company v. Mallard Truck Lines, Inc., 340 So.2d 372 (La.App. 1st Cir. 1976) were made to a surviving widow for loss of love, affection and support.
Our examination of authorities involving similar instances of such awards to widows, discloses that while the award to Mrs. Este is somewhat on the low side, the record as a whole does not show this award to be so low as to constitute a clear abuse of the discretion vested in the jury. Consequently, we may not alter the award. Coco v. Winston Industries, Inc., supra.

AWARDS TO THE ESTE MINORS
The Este minors, Kevin and Todd, were 7 and 4 years of age, respectively, on the date of decedent's death. The jury award of $250,000.00 each is contested by defendants as grossly excessive. We agree. We must therefore reduce these awards to the highest awards reasonably within the discretion of the trier of fact, as demonstrated by awards in cases involving similar circumstances. Coco v. Winston Laboratories, Inc., supra.
The highest award given a minor for loss of love and affection of a father is $30,000.00. Barr v. State, Through Louisiana Department of Highways, 355 So.2d 52 (La. App. 2d Cir. 1978). So far as we can determine, the highest award made to a minor for loss of support of a father is $35,500.00, Johnson v. International Insurance Company, 347 So.2d 1279 (La.App. 1st Cir. 1977), which involved a decedent earning projected annual wages of $8,858.21. Barr v. State, Through Louisiana Department of Highways, supra, affirmed an award of $35,000.00 to a 7-year old minor for loss of a father's support, without mentioning the earning capacity of the parent.
We conclude, therefore, the Este minors are each entitled to $30,000.00 for the loss of their father's love and affection. Considering the difference in earning capacity between the father in this instance and Johnson, supra, we find each said minor entitled to $50,000.00 for loss of support, or a total award of $80,000.00 each.

DECREE
It is ordered, adjudged and decreed that in the Case action, Number 12,615, the judgment appealed is affirmed and amended to provide that State Farm be paid by preference the sum of $7,500.00 by the defendants cast therein; all costs to be paid by defendants cast.
It is further ordered, adjudged and decreed that in the Este action, Number 12,616, the judgment is amended to reduce the awards to the minors, Kevin and Todd Este, from $250,000.00 each to $80,000.00 each, and in all other respects the judgment is affirmed; costs to be paid by defendants cast.
Judgments amended and rendered.